## HUDSON *vs* WARNER & VANCE.—June, 1828.

A bill of sale of personal property made upon a good consideration, as, to indemnify the grantees against suretyships entered into, and to be entered into, is available between the immediate parties to the instrument, altho' not recorded.

Where a mortgage was executed of the entire stock in trade in the mortgagor's store, and three years afterwards, the stock in the same store was sold by trustees for the benefit of his creditors, in the absence of evidence, that in the intermediate time, there was an entire sale of the original stock, or that the part sold was replaced, or that any new stock was purchased and mingled with the old, it will be intended, that the sales made by the trustees, were of the remnant of the stock of goods mortgaged.

The grantee of a second mortgage of personal property recorded in time, *with notice* of a prior mortgage which was not duly recorded, is bound by the equitable rights of the first mortgagee, unless upon inquiry into the nature of his claim, the first mortgagee had led him to believe, that his incumbrances were removed, in which case, equity would never interpose to invalidate his legal title.

The act of 1729, *ch.* 8, had for its object the suppression of secret sales; by demanding that transfers should be recorded, it was intended that notice should be given, that no one might be injured, or deluded, by secret and unknown conveyances.

Its object then being to protect creditors from prior secret conveyances,

any such creditor who had notice of any such incumbrance, could not be considered as falling within the class for whose benefit that act was passed.

The retention of possession of personal property, by a vendor, will not contaminate his transfer, where his deed showed, that the sale was not to have its completion immediately, but was prospective to a future event; till that future time, his possession is entirely consistent with his deed.

The failure of a mortgagee of personal property, to take possession at the time of the forfeiture, as stipulated in the mortgage, does not vitiate a deed, which in its inception was valid and effectual.

APPEAL from the Court of Chancery.   The bill of the complainants,  *W. Warner* and *W. Vance*, (now appellees,) stated, that on the 4th of February 1820, having lent to and endorsed for *J.* and *T. Vance* divers promissory notes to considerable amounts, which were negotiated for the use and benefit of the said *J.* and *T. Vance*, in consideration thereof, and for the purpose of securing the payment of the said notes, and of other notes which might thereafter be lent and endorsed by the complainants, or either of them, to the said *J.* and *T. Vance*, whenever payment thereof should be required by the complainants respectively, the said *J.* and *T. Vance* agreed to execute a certain deed of trust or mortgage.   In pursuance of which agreement, the said *J.* and *T. Vance* on the said 4th of February, 1820, bargained, &c. unto the complainant's, all and singular the books, stationary, goods, wares, merchandises, effects and property, of or belonging to the said *J.* and *T. Vance*, situated or being in the store nu nbered 178, then occupied by them, and standing on the north side of *Baltimore street*, &c. and every the debts and sums of money due and owing or payable to the said *J.* and *T. Vance*, and all books of accounts, bonds, bills, &c.   Provided that if the said *J.* and *T. Vance*, their executors, &c. should, whenever thereto required by the complainants, well and truly pay, &c. all the promissory notes that had at that time been lent to, or endorsed for them by the complainants, respectively, as all that might thereafter be so lent or endorsed, then the said instrument of writing to be void.   That it was also provided by the said instrument of writing, that if default should be made by the said *J.* and *T. Vance* in payment of the said notes, then the said assignment

was declared to be made in trust, that the complainants should sell and dispose of at public auction, &c. all the said property; and the proceeds, when received, to be applied to the payment of the said notes, and the balance, if any, to be paid to the said *J.* and *T. Vance.* That by the said instrument of writing the complainants were constituted attorneys to collect, recover and receive, all the debts and sums of money so transferred and assigned for the said trust, &c. They further charged that the complainants had then lent to, and endorsed notes for the said *J.* and *T. Vance,* and had since renewed the said notes, and lent and endorsed other notes for them to a very large amount, &c. That the complainants finding their responsibility very great, and the banks requiring large reductions to be made on the said notes as they became due, called on the said *J* and *T. Vance,* and required them, agreeably to the provisions of the said instrument of writing, to pay, take up and retire, the said notes, which they refused to do, and have never done; but the complainants had been obliged to take up the said notes, and from their own funds. The bill also charged, that in the month of March 1822, the complainants called on the said *J.* and *T. Vance* for a delivery of the effects and property mentioned and contained in the said instrument of writing, they being advised, that a delivery of them was necessary. That the said *J.* and *T. Vance* did not object thereto, but on the contrary, put the complainants into possession thereof, and permitted them to take an inventory of the effects on hand. That the complainants, confiding in the honesty and fidelity of the said *J.* and *T. Vance,* permitted them to remain in the said store, and as the agents of the complainants, to sell any articles they could, with the understanding that the proceeds should be paid to the complainants in part liquidation of the notes they had respectively taken up and retired for the said *J.* and *T. Vance.* The bill also stated, that *T. Vance,* one of the said firm of *J.* and *T. Vance,* on the 18th of May 1822, executed an instrument of writing, purporting to be a bill of sale, and thereby, in the name of *J.* and *T. Vance,* conveyed to *B.* and *H. Hudson* the property before conveyed and delivered to the complainants, the said *B.* and *H. Hudson* having full knowledge of the bill of sale so executed by the said *J.* and *T. Vance* to

the complainants.   That since then the said *B. Hudson* and *T. Vance* have departed this life.   That *J. Vance*, the surviving partner of *J.* and *T. Vance*, by consent of all parties interested therein, executed an instrument of writing to *A. Neale, F. Lucas*, and *J. J. Donaldson*, in trust for the creditors, of all the effects and property, debts, &c. belonging to the said firm, with the understanding that that conveyance should not prejudice the prior claimants.   That the said trustees have sold the said effects and property, so conveyed to them in trust, and have the proceeds in their hands ready for distribution.   Prayer, that the said *J Vance, A. Neale, F. Lucas, J. J. Donaldson,* and *H. Hudson,* may answer, &c. and that *A. Neale, F. Lucas,* and *J. J. Donaldson,* may give an account of the sales of the property, &c.   That the nett proceeds of the said sales of the effects and property, as well as the said books of accounts, bonds, &c. due and owing to the said *J.* and *T. Vance* prior to the said instrument of writing, be brought into court, and delivered to the complainants; and for general relief, &c.

The answer of *H. Hudson,* survivor of *B. Hudson,* of the late firm of *Hudson & Co.* of *Hartford,* in the state of *Connecticut,* stated that *J.* and *T. Vance,* being justly indebted to the late firm of *Hudson & Co.* in the sum of $3888, for books and stationary theretofore sold and delivered to them by the said *Hudson & Co,* as well as for money advanced for them, &c. did, on the 18th of May 1822, sell and deliver to this defendant all the books, goods and stock in trade, of the said *J.* and *T. Vance,* then in the store No. 178, Market-street, *Baltimore,* and in the rooms and warehouses adjacent thereto; and also all the books, stationary, and other property, in which the said *J.* and *T. Vance* had any interest, then in the possession of *W. Warner,* or any other person or persons whatsoever. That when the defendant obtained the said bill of sale of the said property, the said *T. Vance* was alone in possession thereof, and that the sign of *J.* and *T. Vance* was suspended over the door of the said store; and the said *T. Vance* made delivery thereof, as in the said bill of sale is stated, viz. "One set of *Gill Blas,* and one set of *Sterne's Works,* in the name of the whole of the said property so transferred, and as a token of the manual delivery of the whole, to the said *Hudson & Co.*

at the date of this assignment." And also of the key of the said store, to *C. Mitchell*, as the agent and attorney of the defendant, on the day of the sale thereof, and the same was afterwards delivered to the said *Vance*, who received the same expressly as the agent and trustee for *Hudson & Co.* only. And the bill of sale was, on the same day, left with the clerk of *Baltimore* county court, to be recorded. That the bill of sale which is set up and pretended by the bill of complaint of the complainants, was collusive, fraudulent and void, the same having been more than twenty days unrecorded, although the vendors were in possession of the goods and books thereby pretended to be sold; and further, that the said *W. Warner*, nor the said *W. Vance*, had not then, as the defendant believed, paid any part of the money for which they now pretend to have become security for, nor were they *bona fide* creditors of the said *J.* and *T. Vance* at that time. The defendant denies, that at the time he obtained the said security by the said bill of sale, he had any notice of any previous legal or equitable lien or incumbrance upon the said property therein mentioned, in favour of the complainants, or either of them, or of any other person or persons, except the landlord of the premises, for rent; nor had he any notice of any previous delivery or pretended delivery thereof, into the possession, or disposal of the complainants, or either of them, or of any other person on their account, excepting only the book of accounts of the firm of *J.* and *T. Vance*, and other evidences of outstanding debts due to the said firm, which are referred to in the defendant's bill of sale, as in the possession of *W Warner*, which as the said *T. Vance* then represented to the defendant, amounted to the sum of $40,000 and upwards, and were more than sufficient to pay all the debts of the said firm; but that the said books, and other evidences of debts, were then unjustly withheld from his possession and control by the said *W. Warner.* That the said *Vance* proposed to transfer to the defendant the same, together with his said stock and books, then in his said store and warehouses, as additional security for his said debt. That the defendant previous to taking his said bill of sale, inquired of the said *T. Vance*, if there were any outstanding incumbrances on the said property, and was informed

by him, that endorsements had heretofore been made by *War-ner* for *J.* and *T* *Vance*, and a contract of indemnity given to him, accompanied with a bill of sale upon some part of their property, but what part he did not state, but said that *Warner* had never been called upon to pay any of the notes of *J.* and *T.* *Vance*, and that the security which had thus been given to him, and the said pretended bill of sale, were of no avail, and had not been recorded, but were null, fraudulent and void; and that the same could not, therefore, be rightfully enforced a-gainst the said *J.* and *T* *Vance*, or any of their creditors. That the same was founded upon no valuable consideration, and could not impair the security he then proposed to give to the defendant, even as to the books of accounts and securities then in the hands and possession of *Warner*, and much less, incumber, in any way, the books and stationary then in the said store No. 178, Market-street, and the rooms and ware-houses adjacent thereto, which he then agreed to transfer to the defendant by the bill of sale as aforesaid, and whereof the said *Vance* then appeared, and represented himself to be in the sole and exclusive possession, of, for and on account of the firm of *J.* and *T.* *Vance*, and not a trustee to or for any other person or persons. And the defendant verily believed the informa-tion so given to him by the said *Vance*; but for greater cer-tainty therein, previous to his taking the said bill of sale, and upon the day it bears date, caused search to be made in the clerk's office of the county court of *Baltimore*, for the record of the said pretended bill of sale, in order to ascertain, if pos-sible, what property it included, and whether the same was valid; and no such record being then found, and, as the defen-dant believed, not being then recorded, he concluded, as he lawfully and equitably might and ought to have done, that no valid bill of sale affecting the said property could be outstand-ing, either in favour of the said *Warner* or of any other per-son or persons, so as in any way to impair the security the said *Vance* then proposed to give to the defendant upon the said books, &c. then in the said store, and warehouses adjacent thereto, whereof the said *Vance* then appeared to have, and as the defendant then verily believed, had the entire and ex-clusive control and disposal; and under this impression and be-

lief, the defendant took and received the said security. The answer further stated, that the defendant had been informed that the fund sought by the complainants, as in the hands of the trustees, was raised entirely and exclusively from the sale of the said books, &c. so as aforementioned transferred to the defendant by the said bill of sale. The defendant, in his said answer averred, that at the period aforesaid, and before he obtained the said security from the said *Vance*, but on the same day, the said *W. Warner* knew that the defendant had a large claim against the said *J.* and *T. Vance*, and conversed with the defendant respecting the same; but gave no notice or intimation to the defendant that he had any lien or claim, or bill of sale, upon the said goods, books, stationary, or stock in trade, in the said store and warehouses; but from the general tenor of his conversation with the defendant, the defendant was led to the impression that the said *J.* and *T. Vance* had given no security whatever to the said *Warner*, for what he pretended to claim against them. That if the pretended claim of the complainants, under the pretended bill of sale, as now set up, is established, the defendant will be defrauded out of his just and honest debt, which he trusted had been fairly and *bona fide* secured by the bill of sale to him. That he verily believes the complainants are not creditors of *J.* and *T. Vance* to the amount set forth in their bill of complaint; and he prays that they may prove the true amount thereof, and when and at what time, and on what account, any advances were made by them for the said *J.* and *T. Vance*, &c. and that the said bill of sale to the complainants may be declared null and void; and that the said trustees may be decreed to pay to the defendant the proceeds of the said goods, &c.

The answer of *J. Vance*, admitted the execution of the bill of sale to the complainants, and for the consideration therein expressed; and that a large amount of notes so lent to, and endorsed by, the complainants respectively, were not paid at maturity, by the firm of *J.* and *T. Vance*, and were either paid by the complainants, or renewed in their own names. That he was not in *Baltimore* when the bill of sale, said to be executed by *T. Vance*, in the name of the firm, to *B. Hudson* and *H. Hudson*, was made, and which, if executed, was without

his concurrence or approbation. That at the request of the creditors, &c. he executed the bill of sale to *A. Neale,* &c.

The answers of the other defendants do not seem to be necessary, as to the question decided in this case. Commissions issued, and much testimony was taken thereunder, and the cause was argued and submitted for decision.

BLAND, Chancellor, (July term 1825.) The facts and circumstances in this case are sufficiently obvious as regards the question to be decided, and, therefore, need not be digested and stated.

It is said that every case on the registry acts both in *England* and *Ireland,* which has been brought before a court of equity, has been determined on the ground that those acts do not affect the great fundamental principles of equity; but that every purchaser, claiming under a registered deed, is left open to any equity which a prior purchaser or incumbrancer may have. There seems to be nothing in any of our acts of assembly, requiring conveyances of real or of personal property to be recorded, which should induce a court of equity of this state to consider them, as in this respect, at all different in their effect and operation from the registry acts of *England* and *Ireland.* Indeed, it may be strongly inferred from the language of the legislature itself, in the act for enlarging the powers of the high court of chancery, that all those acts of assembly, whether they relate to the recording of deeds for real or for personal property, are to be construed as those of *England* and *Ireland* have been, in relation to any prior equity.

It will, therefore, be assumed as a settled principle, that a person claiming property under a deed or conveyance, which has been duly executed and recorded, must take it subject to all other claims, of which he has had actual notice before the execution of his deed. Because after such notice, the accepting and recording of a conveyance, must be considered in equity as fraudulent, since the party actually had that notice which it was intended by the act of assembly he might have had by the recording of the conveyance of the prior claimant. But then to affect a record deed by notice of a deed unduly recorded, or one which has not been in any way recorded, the holder of the

regularly recorded deed must have had actual notice, and it must be clearly proved. For no mere rumours, or even strong suspicion of notice, will gratify a court of chancery in breaking in upon the acts of assembly, which require deeds to be recorded. In this case, although the deed of the 4th of February 1820, was unduly recorded long after the time limited by the act of assembly, yet the chancellor is perfectly satisfied and convinced by the proofs in the cause, that *Hudson & Co.* had actual and express notice of its existence before the execution of the deed from *J.* and *T. Vance* to them; and, therefore, the claim of *Hudson & Co.* must be postponed, and give place to that of *Warner* and *Vance.* And *Neale, Lucas* and *Donaldson,* the trustees under the deed of the 20th of January 1828, will be directed to apply the proceeds of the debts and property which were so conveyed to them, in trust, after deducting all their necessary expenses, and a commission to be allowed them of seven *per centum* on the whole amount they have and may disburse—First, to the payment of the rent for which the property was distrained and liable—next to the satisfaction of the claims of the plaintiffs under their deed of the 4th of February 1820,—then to the satisfaction of *Henry Hudson's* claim, as surviving partner of the firm of *Hudson* and *Co.* under their deed of the 18th of May 1822, and the residue, if any, according to the terms of the deed of the 20th of January 1823. And for the purpose of having this adjustment made—*Decreed,* that the cause be referred to the auditor, with directions to state an account accordingly, from the proceedings and proofs, and such other proofs as the parties may produce in relation to any necessary expenses incurred in the execution of the trust under the deed of the 20th of January 1823.

The auditor reported accordingly, stating the amount of the sales by the trustees to be $3036 05; and, after deducting the trustees' commission, their expenses, paid for house rent, and the costs of suit, amounting to $1250 23, he stated that there was due to *W. Vance* $2299 16, and his proportion of the balance was $365 33, and to *W. Warner* $8939 67, and his proportion of the balance was $1420 49. This report was ratified and confirmed by the Chancellor on the 22d of October 1825, and the trustees were decreed to pay to the complain-

ants, or bring into court to be paid to them, the sums of money respectively allowed to them in the said report of the auditor. From this decree *Hudson* appealed to this court, and in his petition to the chancellor for the appeal, he prayed that on giving bond and security for the costs and interest on the money to be brought into court, that the amount to be brought in might be retained in court until the final decision of the case in the court of appeals. The chancellor granted the appeal; and ordered that all proceedings in the case, pending the appeal, be stayed on the defendant's filing within the time limited by law, a bond to the complainants, with the usual condition. in the penalty of $6072 10, with a security or securities to be approved by the chancellor.

The cause was argued before BUCHANAN, Ch J. and EARLE, MARTIN, STEPHEN, ARCHER, and DORSEY, J.

*Taney*, (Attorney General,) and *Mitchell*, for the Appellant, contended, 1. That the complainants' security was void for want of record or registry, under the act of assembly, within 20 days.

2. That no possession was ever delivered to the complainants at the time of their mortgage, or at any time thereafter; but that the property remained in possession and control and disposal of *J* and *T. Vance*, until *Hudson* received it from them, and that as against him, a *bona fide* purchaser, without notice, the deed to the complainants was fraudulent and void.

3. That *Hudson* had no such notice as to inflict him with fraud in taking a bill of sale of the property; but on the contrary, that concealment was practised by the complainants to mislead him, and that he was misled in fact, although he used due diligence to obtain knowledge.

4. That the security to the complainants was without consideration, and ought not to have been sustained by the chancellor against *Hudson*; or, at all events, not to the amount allowed by the chancellor.

5. That there was a fraudulent resulting trust to *J.* and *T. Vance* in their deed to the complainants, and the deed was void, whether registered or not, on the principles of the common law.

6. That *Lucas*, one of the defendants, was not a competent witness for the complainants, and not made so by any proceeding before the commissioner who took his testimony.

7. That the chancellor's order requiring security for the fund, and denying the prayer of *Hudson* to have the money brought into court, was illegal; and that the distribution of a fund, after an appeal had been taken, was irregular and unwarranted by law—the fund being in the hands of the trustees, who were before the court; and that this court may direct the money to be brought in by the trustees now, they having notice of the appeal. They cited, in their arguments on the several points, the *Act of Ass.* 1729, *ch.* 8. *Dorsey v Smithson*, 6 *Harr &* *Johns* 63. *Stat.* 13 *Eliz. ch.* 5. *Fitzhugh v Anderson*, 2 *Hen. & Munf.* 308, 303. *Sturtevant v Ballard*, 9 *Johns. Rep.* 337. *Esp. Evid.* 238. *Hamilton v Russell*, 1 *Cranch*, 316. *Weller v Wayland*, 17 *Johns. Rep.* 102. *Brinkerhoff v Marvin*, 5 *Johns. Ch. Rep.* 327. *Shirras v Caig*, 7 *Cranch*, 34. *Livingston v M'Inlay*, 16 *Johns. Rep.* 165. *Wordall v Smith*, 1 *Campb.* 332, 333. *Boyd v Dunlap*, 1 *Johns. Ch. Rep.* 484. 3 *Bac. Ab.* 313. 19 *Ves.* 434, 437.

*Winchester*, for the Appellees, insisted, 1. That the bill of sale from *J.* and *T. Vance* to the complainants, of the 4th of February 1820, being *bona fide*, and for a valuable consideration, was as between the parties to it, binding and effectual, although not recorded in time.

2. That *Hudson* having had *actual notice* of the deed of the 4th of February 1820, before he obtained his bill of sale from *T. Vance* of the 18th of May 1822, was equally bound with *J.* and *T. Vance.*

3. That *independently* of the bill of sale to the complainants, they had acquired title to the property in question by an actual and *bona fide* delivery thereof in the month of March 1822, two months before *Hudson*, or his agent, had applied for or obtained a bill of sale.

4. That the bill of sale from *T. Vance* to *Hudson* was obtained *by fraud*—was not *executed* according to the act of assembly; and that *Hudson*, or his agent, never had either an *actual* or *legal* possession of the property.

*First Point.* It is not necessary to produce authority to sustain this position. The deed itself purports consideration, besides the proof in the cause. That there was a debt *actually* due appears, 1st. by the answer of *J. Vance*; 2d. by the testimony in the record. Here then is a conveyance *bona fide* and for a va'uable consideration, and which no one will dispute, is binding on *J.* and *T. Vance, if they were defendants.* There is no tainted spot in *this transaction* on the part of the complainants. They were not only *bona fide,* but suffering creditors.

*Second Point.* The principle is that a purchaser, under a recorded bill of sale, must take it subject to all other claims of which he had actual notice *before the execution of his deed;* because it would be otherwise a fraud. If this bill of sale had been recorded, who would doubt but that it would take preference of *Hudson;* and *a fortiori,* if he has notice *actually given to him.* The whole policy and object of the recording statutes in *England* and our law was, to give notice. Recording was not a *substitute* for *actual* notice, but auxiliary to it. 1 *Madd Ch.* 327, 328. *Anderson v Maltby,* 2 *Ves. jr.* 254, 255. 2 *Eden,* 228. *Frost v Beekman,* 1 *Johns. Ch. Rep.* 302. What kind of notice is necessary to put a purchaser upon inquiry, &c? *Sugd.* 498. *Smith v Low,* 1 *Atk.* 490. *Ward v Turner,* 2 *Ves.* 437, 440. *Underwood v Lord Courtown,* 2 *Sch. & Lef.* 66. 3 *Bac. Ab.* 313. The proof on the question of notice is abundant, as will be seen in the record.

*Third Point.* The possession by the complainants, *independently* of the deed, gave them a good title; and of *this possession,* there is the most conclusive proof *Hudson* had notice. The law is clear, if there was a *bona fide* and *actual delivery,* the title would pass as against all *the world;* and most certainly as to any one having notice. The possession of the complainants was *bona fide,* and not collusive, as proved by the evidence.

*Fourth Point.* He who takes a bill of sale, does so subject to notice of all previous claims. In the bill of sale to *Hudson,* *T. Vance* is the only grantor. It was signed by him, in the name of *J.* and *T. Vance,* but not sealed; and it was acknow-

ledged by *T. Vance* only. The act was done without the knowledge and against the wish, consent, or authority of his partner. It was a fraud upon his co-partner. One partner cannot transfer the property of the partnership in this manner. He could not alone, without authority from his co-partner, make a valid bill of sale. It was not executed in conformity to the act of 1729, *ch.* 8. It was clearly a fraud attempted upon the complainants. There was nothing like a delivery and possession legally made and delivered, as is fully proved by the evidence. The property had been previously seized under a distress for rent, and was at that time in the custody of the law, so that it could not be transferred.

ARCHER, J. delivered the opinion of the Court. The chancellor has in this case decreed, that the funds in the hands of the general creditors of *John* and *Thomas Vance*, shall be appropriated in the first place to the discharge of the claim of *William Warner* and *William Vance*. *Hudson*, surviving partner of *Hudson* and *Co*, claims priority in the distribution of these funds in virtue of his bill of sale from *Thomas Vance*, of the firm of *John* and *Thomas Vance*, dated the 22d of May 1822; and as his claim has been postponed, he has prayed an appeal to this court.

The appellant relies on his legal title, which he contends overreaches any lien which *Warner* and *Vance* could have on the property.

The bill of sale made in 1820 to *Warner* and *Vance* was made upon a good consideration. It was made to indemnify them against suretyships entered into, and to be entered into by them for *J* and *T. Vance*, and it cannot be questioned, but that it was perfectly available as between the immediate parties to the instrument, although it was not recorded. It might be void against *creditors* who were injured by it; yet, nevertheless, binding on them. The principle was settled by this court in the case of *Dorsey v Smithson*, 6 *Harr. & Johns.* 63.

If it be binding on *J.* and *T. Vance*, the next subject of inquiry will be its effect upon the transfer made to *Hudson*, and whether it will overreach the claim of *Hudson?* And

this will depend on the solution of several questions—whether the mortgage of *J.* and *T. Vance* to *Warner* and *Vance* covered the property claimed by *Hudson?* If it did, whether *Hudson* had notice of the lien of *Warner* & *Vance?* And lastly, the effects of such notice, if any such existed, upon the claim of *Hudson*.

The mortgage covered the stock of books and stationary in the store of *J.* and *T. Vance* at its date, and the fund, now for the disposition of the court, arose from the sale of the books and stationary in the store in February 1823, a period of three years after the date of the mortgage. The ability of the instrument to cover the proceeds of the sales of the stock mortgaged, which might remain in the hands of *J.* and *T. Vance*, or such additional stock as, with the proceeds of the sale, or by other means, might have been purchased by *J.* and *T. Vance*, and put in their store, to replace such sales as may have been made by them between the date of the mortgage and the date of the sale by the trustees of the general creditors, need not be examined or determined in this case. There is no evidence to show that there was an entire sale of the old stock, and that it was replaced by new, between the date of the mortgage and the sale by the trustees; or that any books or stationary were purchased in the intermediate time, and mingled with the old stock. There is evidence of sales, but no testimony to show that the original stock was exhausted or partially replaced; and in the absence of such testimony, we cannot but intend, that the sales, which took place under the superintendence of the trustees, were of the remnant of the stock of goods mortgaged. It is certain that goods were received from *Hudson* by *John* and *Thomas Vance*, and were credited in their books; but whether they were brought to their store, and mingled in the general mass of their capital, is not in evidence.

The next subject for consideration will be, whether *Hudson* had notice of the pre-existing lien of *Warner* and *Vance*. *Hudson* must be supposed to be conusant of the facts stated in his own bill of sale, and the transfers therein made. Looking at this, we find a conveyance of all the books and *stationary*, and *other property in the possession of Warner*, in which *J* and *T. Vance* had an interest. *Hudson*, in his answer, en-

deavours to limit the generality of these expressions, and inti-
mates, that they had reference solely to the books of accounts
and evidences of debt, of which *Warner* had taken posses-
sion. But if this were the object, and he had no reason to
fear that *Warner* had taken possession of the books, stationa-
ry and other property, it would be difficult to divine a reason
for the insertion of these general words in the instrument.
When we examine the testimony in the cause, and look at the
efforts of *Warner* to take and maintain possession of the store,
these general words in the conveyance, strongly incline us to
believe that *Hudson* could not have been unaware of the
claim of *Warner*, and of the facts which actually occurred as
springing out of that claim. But independent of the bill of
sale, the answer distinctly admits the notice, before the execu-
tion of his bill of sale, that *Warner* and *Vance* had received
a conveyance. It is true he was, at the same time, apprized
that nothing was due upon the conveyance; but from whom?
from his creditor, who was then pressed to give him a security
for his debt. Ought he to have confided in such an interested
representation from one whom, common sagacity might have
admonished, would, very naturally, be inclined to rid himself
of the pressing solicitations of importunate creditors, by the
most favourable representations, of the unincumbered and un-
shackled condition of his estate? He was not, in truth, so
easily imposed upon. At least he was not willing to confide
entirely in *Vance's* statement; for we find, that notwithstand-
ing he had been informed by *Vance* that his bill of sale to
*Warner* was never placed upon the records, he examines into
this fact for himself, and when he ascertained satisfactorily that
nothing was on record legally binding the property, he resolves
to take the title, and hazard the experiment, whether his title
could not be made to override any unrecorded transfer to *War-
ner* and *Vance*. That such information, thus imparted to him,
sufficiently affected him with notice, cannot be doubted, par-
ticularly when that information was accompanied with no equi-
vocal indications, that the first conveyance was meant to reach
the identical property, of which he took the transfer. If *Hud-
son* could have supported by testimony what he has set up in
avoidance of this notice, his claim would have been presented

in a very different view before this court.   Could he have esta-
blished the fact that he had made the inquiry of *Warner*, into the
nature of his claim and lien, and had been led by *Warner* to
believe that his incumbrances were removed, equity would
never interpose to invalidate his claim.   But these facts were
necessary to have been established, as they constituted the on-
ly effective part of his defence, and it is scarcely necessary to
say, that his answer can furnish no evidence of these facts.

There is one part of this transaction which cannot escape the
remark of the most superficial observer.   And in adverting to
it, we, by no means, intend to cast any censure on Mr. *Hud-
son*, as he was in the pursuit of a just claim, and of the means
of securing it.   The ceremonies attending the execution of this
bill of sale were peculiar.   To give it validity they were whol-
ly useless.   Why was adopted the symbolical delivery of the
goods by the delivery of the key of the warehouse?   One
would have thought this was sufficient, yet to this was superad-
ded, for greater security, the delivery of a book in the name of
all the books, stationary and goods.   If the transmission of
the legal title was the object, these proceedings were useless,
as his bill of sale effected that object.   On the other hand, if
the goods were to be transferred by delivery, then the bill of
sale was unnecessary to be recorded, and all the stipulations
upon which the delivery was to take place could have been ef-
fected by a writing, neither demanding record, nor acknow-
ledgment.   These ceremonies, and this *formula*, lead irresisti-
bly to the conclusion, in connexion with the bill of sale, an-
swer and evidence, that *Hudson* had such a notice as would
affect his conscience, and that there existed some pre-existing
equity, which this machinery was to destroy, and which when
prostrate, would permit his legal possession to rest in security.

As it appears conclusively to our minds that *Hudson* had
notice, we are led to the examination of the effect of such no-
tice upon his title.   The act of assembly of 1729, *ch.* 8, had
for its object the suppression of *secret* sales.   By demanding
that transfers should be recorded, it was intended, that notice
should be given, that no one might be injured or deluded by
*secret* and *unknown* conveyances.

Its object then, being to protect creditors from prior secret

conveyances, any such creditor, who had notice of such an in-cumbrance, could not be considered as falling in the class of those for whose benefit the act was passed. For when he had notice, how could he be considered as injured by the convey-ance? We cannot give the act the narrow construction, which seems to be contended for, that no notice was sufficient to grati-fy the law, but such as was derived from the registry of the deed; for such a construction would invalidate transfers, which, it is obvious, from the general tenor of the act, it was not the purpose of its framers to disturb, or interfere with. Any other kind of notice of the transfer, which demonstrates the exist-ence of a lien, or the transfer of a right, brought home to the party who seeks to avoid such lien or transfer, will be suffi-cient

But although the bill of sale to *Warner* and *Vance* was made upon a good consideration, *Hudson's* bill of sale cannot be overreached by the previous bill of sale, unless it appear that an incumbrance, as against him, was created by it, which was not condemned as fraudulent by the peculiar circumstances which attended it.

The consideration of the unrecorded mortgage to *Warner* and *Vance* was two-fold—to guard them against injury from former securityship, and for anticipated loans and endorsements of notes. But, it is said, the recital which explains the object and purposes of the deed, is not conformable to the facts. If this be so, it would certainly subject the instrument to a very rigorous scrutiny, and a misrepresentation in this respect would subject it to strong suspicion. But it would not follow, that every variance in the statement of the real facts of the case, would defeat and destroy the instrument, where it appeared that the transaction was fair on the whole, and indemnity was the real objects of the parties. Nor would the court be dispos-ed to hear with a very favourable ear, the objections of one who had received no injury from the transaction.

But in truth, there is no suggestion of falsehood, as we ap-prehend, in the recitals of the bill of sale. The responsi-bility of *Warner* and *Vance* had been undertaken for *John* and *Thomas Vance*, as was anticipated in the mortgage; and although there is no direct evidence that prior to the mortgage

notes had been loaned, yet they may have been so loaned; and constituting now no part of their claim, we fairly presume from the course of business, that the earliest notes found in the record were, many of them at least, renewals of former ones loaned or endorsed by *Warner* and *Vance.*

In the retention of possession by *John* and *Thomas Vance* there will be found nothing to contaminate the transfer, for the possession was consistent with the deed; and although this would not necessarily render it valid, yet by the agreement of the parties it was not to have its completion immediately, but was prospective to a future event; that is, the default on the part of the mortgagors to pay the amount of the promissory notes whenever their payment should be demanded by *Warner* and *Vance.* And in such a special case it has been adjudged *(Bucknal v Roisten, Prec. in Ch.* 287,*)* that possession by the vendor till that future time, is entirely consistent with the deed. And if the deed is good at its commencement, it has been determined that it shall continue so, notwithstanding possession is retained at the time of the forfeiture. *Lady Lambert's* case, *Shep. Touch.* 65. *Stone v Grubham,* 2 *Bulst.* 25. *Roberts on Fraud. Conveyances,* 561, *(note f.)*

Their failure then, to take possession of the property at the time of the forfeiture as stipulated in the mortgage, does not vitiate a deed which in its inception was valid and effectual.

It appears then, from our view of this case, that the mortgage from *J.* and *T. Vance* to *Warner* and *Vance* was binding between the parties thereto; that it was valid at common law, notwithstanding the retention of possession, its completion looking to a prospective event; that being valid in its commencement, it was not condemned by a failure on default to take possession of the property; that *Hudson* having notice of this conveyance, is bound by the prior lien which it created, and that he is not to be considered in the light of an injured creditor, having had such notice, and, therefore, not entitled within the meaning of the act of 1729, *ch.* 8, to set up his title against the prior deed, and by so doing to treat it as a nullity.

                                        DECREE AFFIRMED.