# HUME v. RIGGS.

LANDLORD AND TENANT; DEEDS OF TRUST ON CHATTELS; EQUITABLE LIENS; NOTICE; PRIORITIES.

1. A deed of trust on chattels to secure the rent stipulated for in a lease and also a loan made at the time by the lessor to the lessee, and containing a covenant on the part of the lessee to keep the chattels insured, with an assignment of the insurance to the trustees as further security, will not secure rents accruing due after the expiration of the lease.

2. That the lessor or his successors, under such circumstances, may have believed that the security would run with the occupation of the leased premises, indefinitely, whether under a tenancy by sufferance or a new contract, or that the lessee subsequently, by act or word, acquiesced in or confirmed the lessor's views of the continuation of the security, cannot change the legal effect of the lease as between the immediate parties thereto or their successors in interest.

3. And, under such circumstances, the continuance of the insurance by the lessee for the lessor's benefit will not necessarily amount to such a confirmation, nor will the failure to release the deed of trust after payment of the loan secured have such effect.

4. A written instrument made by the tenant, under such circum-

stances, charging the chattels covered by the deed of trust
with the payment of arrears of rent which had accrued after
the expiration of the lease, and authorizing the surviving
trustee in the deed of trust to sell them to satisfy such rent in
arrears, gives the creditor an equitable lien upon such chattels.

5. And where the debtor, in such case, is insolvent, but the security
   is given in good faith with no intent to defraud other creditors,
   his act amounts to a preference by a failing debtor of one
   creditor over others, which is not contrary to the statute in
   this District relating to assignments, except when attempted
   as a feature of, or as one of a series of acts equivalent to a
   regular assignment for the benefit of creditors; *following*
   Strasburger *v.* Dodge, *ante*, p. 37. ·

6. The lien created by such an instrument is not lost, under the act
   of Maryland of 1729, Ch. 8, as against the claims of unsecured
   creditors at the date of the instrument, by the failure to
   acknowledge and record it.

7. Nor will the lien of judgments secured by such creditors after
   notice of the existence of such an instrument, be superior to
   the equitable lien created by it, the equity under a trust or
   contract *in rem* being superior to that under a judgment lien.

8. But credits given by unsecured creditors to the debtor after the
   date of such instrument and before notice by them of its exist-
   ence, will take precedence over the lien created by it, especially
   when it appears that such credits were given upon the faith
   of the debtor's ownership of the property.

No. 717.   Submitted February 9, 1898.   Decided March 8, 1898.

HEARING on an appeal by two of several defendants from
a decree in a suit for an injunction against the marshal of
the District of Columbia and others.   *Reversed.*

The COURT in its opinion stated the case as follows:

This is an appeal from a decree enjoining the Marshal of
the District of Columbia from retaining in his custody cer-
tain goods and chattels, and enjoining him and the appel-
lants, Frank Hume and Timothy D. Daly, from further
proceedings against the same by virtue of executions that
had been levied thereon under judgments against Caleb
W. Spofford.

The property consisted of the furniture in the hotel known
as the Riggs house, and belonged to Spofford, the lessee of

said house. The house was first leased to Spofford by Geo. W. Riggs, the owner, on December 1, 1877, for the term of five years, upon an annual rental of $30,000, payable in quarterly instalments. On the same day Spofford borrowed $50,000 of George W. Riggs to purchase furniture and fittings for said house. On December 10, 1877, he conveyed all of said property, then in the house and such as might be added from time to time, to Thomas J. Fisher and Charles C. Glover, trustees, to secure the payment of the rent stipulated in said lease, and the $50,000 loan aforesaid, which was represented by five notes for $10,000 each, payable two, three, four, five and six years after date, respectively, with seven per cent. interest per annum. The trustees were empowered to sell the property in case of default in payment.

The trust deed contained a covenant also on the part of Spofford to keep the property insured for the sum of $50,000, while in force, with assignment thereof to said trustees as further security. This insurance was taken out and properly assigned, and was regularly continued during that and the succeeding lease; and at the time this controversy arose the surviving trustee, Glover, held policies therefor amounting to $35,000. The instrument was regularly recorded.

George W. Riggs died before the expiration of the lease aforesaid, and the ownership of the house passed to his heirs.

Spofford held over after the expiration of his lease until March 1, 1883, on which date E. Francis Riggs, one of the heirs aforesaid, and acting for all, leased the house to Spofford for another term of five years at a rental of $20,000 per annum, payable quarterly. Spofford held after this lease expired without any further agreement. In May, 1888, he paid the last of the notes secured by the trust deed. He was always in default in the payment of rent; but all that was due under the first lease was paid before the expiration of the second.

In 1888 he owed $11,000 upon the second lease; this increased to $14,000 on June 1, 1889, and he then gave two

notes for this balance. On October 9, 1890, he notified the lessor in writing that he would pay all arrears by May 1, 1891, and on that day surrender possession of the house. His indebtedness increased, and in April, 1891, he owed $35,000 for rent, including the two notes aforesaid.

Riggs and Spofford entered into negotiations, and Riggs announced his intention, in case of no arrangement, to bring suit on April 15th, so as to be able to obtain judgment at the ensuing May rules. The result was that on April 14 Spofford executed and delivered the following instrument:

"Being now indebted in the sum of thirty-two thousand dollars, unto E. Francis Riggs, agent, on account of rent due to him as my landlord for the use and occupation of the Riggs house, up to the 1st day of March, 1891, and also for rent accruing from said date up to the present time at the rate of $20,000 per annum, and the said E. Francis Riggs, agent, pressing for a settlement, in consideration of the premises and to accomplish an amicable settlement between us, I hereby direct Charles C. Glover, trustee in a certain deed of trust, by survivorship, upon the personal property in said Riggs house, through Charles C. Duncanson, auctioneer, to sell, at public auction, at said Riggs house, all the personal property therein, commencing as early as practicable in the month of May next, and from the proceeds of such sale, to pay and satisfy unto the said E. Francis Riggs, agent, all the rent which up to the time of the commencement of such sale may by me be due to him on account of the use and occupation by me of said Riggs house, after first paying the expenses of and connected with such sale, and to pay over unto me the balance, if any, of such proceeds.

"*Provided, nevertheless*, that I shall have, and I hereby expressly reserve, the right, upon payment of all my indebtedness then existing for rent for said Riggs house, unto the said E. Francis Riggs, agent, at any time before the said sale, to have and enjoy in my own right, and free from any

lien, trust or encumbrance, my original and full title to all my personal property in and upon the said Riggs House.
. "In order to obviate expense and unnecessary publicity, the said sale, if made by said surviving trustee, through said Duncanson, I desire to have advertised in my own name. But no commissions are to be allowed to said trustee."

When this paper was submitted to Spofford it did not contain the last paragraph that now appears therein.

Counsel for Riggs claimed at that time that the original trust deed referred to therein was in force as security for all arrears of rent. Before signing, Spofford consulted counsel, who expressed the opinion that the trust deed did not have the operation claimed; and this information was conveyed to Riggs' counsel. The latter stated that if the continuing obligation of that instrument was denied, he would proceed to enforce his legal rights.

Spofford disclaimed any objection to signing, on that ground, but expressed his desire to avoid the payment of the trustees' commissions as provided therein. One of the trustees, Fisher, had died, and as Glover, the survivor, was the partner and friend of Riggs, the matter of commission was regarded as of no consequence, and the last paragraph aforesaid was then added. Spofford then signed, but did not acknowledge the same so that the instrument could be recorded.

Riggs, it appears, was not then aware of Spofford's indebtedness to others. The appellant, Frank Hume, had for several years sold groceries to Spofford on credit, and kept a running account with him therefor. The other appellant, Timothy D. Daly, was a dealer in butter, eggs, etc., and had supplied Spofford therewith for years, upon credit, from month to month. In addition, he had advanced money to Spofford, lending him at one time $2,500 to help him pay off the last note of the $50,000 loan aforesaid.

Neither Hume nor Daly knew of the existence of the paper of April 14, 1891, until May 2. They believed, and

it seems had the right to believe, that the furniture of Spofford was unencumbered, until this last date.

Between April 14 and May 2 Hume's credit sales to Spofford amounted to $126.28. Daly's sales during the same period are not accurately given, but were probably between $200 and $500.

About the last of April the hotel furniture was advertised in the daily papers for sale at public auction by Duncanson Bros., auctioneers. The advertisement contained no reference to the trust deed or the paper of April 14, or to the purposes of the sale.

On May 2 Hume and Daly learned of the advertisement and made inquiries of Spofford. In the course of interviews with Spofford and his counsel and counsel for Riggs, they were informed of the instrument of April 14, and the circumstances of its execution. Immediately after, on the same day, each filed suit against Spofford, who appeared in court and confessed judgments, one for Hume in the sum of $1,941.38, and one for Daly in the sum of $5,949.43. Executions were at once issued and levied, on the property in controversy. Spofford had no other property subject to execution and was wholly insolvent.

May 9, 1891, the bill was filed by E. Francis Riggs against all the necessary parties, and a temporary injunction was obtained. By agreement the property was permitted to be sold by the trustee, for the benefit of Riggs, who executed a bond in lieu thereof.

On final hearing the injunction was perpetuated, and from that decree the appeal has been taken.

*Mr. S. T. Thomas* and *Mr. Henry P. Blair* for the appellants:

1. A satisfied mortgage cannot be revived as to third parties by any agreement between the mortgagor and mortgagee or extended to any other debt. Pingree on Mortgages (1893), Vol. 1, p. 1155; *Perkins* v. *Sterne,* 23

Tex. 561; *Pelton* v. *Knapp*, 21 Wis. 63; *Marvin* v. *Vedder*, 5 Cowen, 671; *Harris* v. *Hooper*, 50 Md. 537.

2. At common law a mortgage of personalty could only be made by actual delivery. *Twynne's Case*, 3 Coke, 80.

3. The Maryland act of 1729, Ch. 8, Sec. 5, is in force in the District of Columbia. *Colbert* v. *Baetjer*, 4 App. D. C. 416, 424; *Cannon* v. *McMichael*, 6 Mackey, 225.

4. Chattel trust, if not recorded, void as to creditors. *Gill* v. *Griffith*, 2 Md. Ch. 270; *Blennerhasset* v. *Sherman*, 105 U. S. 100, 119; *Stewart* v. *Platt*, 101 U. S. 731, 738; *Bank* v. *Hunt*, 11 Wall. 391; *Moore* v. *Simonds*, 100 U. S. 145; *Byer* v. *Etnyre*, 2 Gill, 151, 161; *Gough* v. *Edelin*, 5 Gill, 101; *Dorsey* v. *Smithson*, 6 H. & J. 61. Even with recordation or notice thereof. *Garland* v. *Plummer*, 92 Me. 397; *Rich* v. *Roberts*, 48 Me. 548; *Sheldon* v. *Conant*, 48 Me. 584; *Selking* v. *Hebel*, 1 Mo. App. 340; *Bevano* v. *Bolton*, 31 Mo. 437, 443; *McDowell* v. *Stewart*, 83 Ill. 538; *Cass* v. *Rothman*, 42 Ohio St. 380; *Honk* v. *Condon*, 40 Ohio St. 569; *Noyes* v. *Brent*, 5 Cranch, 656.

5. On the authority of the cases already cited the alleged mortgage of April 14, 1891, is void as to that portion of account accruing subsequent to the date of chattel trust and prior to notice, if there was such notice.

6. Replevin was the remedy here, if Glover be a trustee as claimed. *Selling* v. *Kimmell*, 6 App. D. C. 273.

*Mr. W. D. Davidge* and *Mr. W. D. Davidge, jr.,* for the appellees:

1. The agreement of April 14, 1891, created an equitable charge or lien upon the property, and will be enforced by a court of equity against the judgments subsequently rendered on May 2, 1891. This agreement is not impeached between the parties. The whole contention is that, as it was not acknowledged and recorded as required by the act of 1729, it is void as against creditors and *bona fide* purchasers. It certainly lacks some of the formalities of a legal mortgage,

but it is clearly a sufficient dedication of certain property to the payment of a certain debt. No particular form is necessary to work an equitable assignment or mortgage. If the intention of the parties to create an equitable lien is apparent a court of equity will enforce it. *Walker* v. *Brown*, 165 U. S. 654. See, also, *Ketcham* v. *St. Louis*, 101 U. S. 306; 3 Pomeroy Eq. Jur., Sec. 1237; 1 Jones on Mortgages, Sec. 163; 2 Freeman on Judgments, Sec. 366.

2. An equitable mortgage has priority over existing creditors and all who take with notice. This is the law both as to real and personal property. *Hampson* v. *Edelin*, 2 H. & J. 64; *Brown* v. *Pierce*, 7 Wall. 205; *Dyson* v. *Simmons*, 48 Md. 207; *Hartsock* v. *Russell*, 52 Md. 619.

The above authorities relate to real estate. There is no difference in principle, however, whether the particular property be real or personal. The act relating to mortgages and bills of sale of personal property in force here is the act of Maryland of 1729, chapter 8. This act, like those above quoted in relation to realty, makes the mortgage void if the mortgagor remains in possession. It applies only to those debts accruing after the execution of the instrument. At common law a debtor could prefer one of several creditors. This act has been several times before the Court of Appeals of Maryland. *Alexander* v. *Ghiselin*, 5 Gill, 138, and note; *Carson* v. *Phelps*, 40 Md. 78; *Hudson* v. *Warner*, 2 H. & G. 415; *Tiernan* v. *Poor*, 1 G. & J. 216.

3. The equitable mortgage is entitled to priority over the subsequent indebtedness. The appellants claim priority solely by virtue of their judgments and levies. They are not entitled to priority. (1) Because of notice of the equitable mortgage before the confession of the judgments. *Johnson* v. *Canby*, 29 Md. 211, 215. (2) Because the subsequent indebtedness is merged in the judgments and the judgments in respect of the existing indebtedness being nearly the full amount must be conceded to be subject to the equitable mortgage. (3) Because the deed of trust, even if as claimed,

a security for only the rent under the first lease and indebtedness was not discharged by payment of the indebtedness after default. 1 Jones on Mort. 888, 889. The interest of Spofford was not the subject of levy. *Harris* v. *Alcock*, 10 G. & J. 226; *Rose* v. *Beaven*, 10 Md. 470. (4) Because when the levy was made the time allowed for acknowledgment and registration had not expired.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The first question presented is, whether the deed in trust of December 10, 1877, secured the rents accruing due after the expiration of the first lease? We entirely agree with the learned justice who presided at the hearing that it did not. Its terms, in our opinion, admit of no other conclusion. The stipulated payments of the first lease are specifically recited and expressly secured. There is no mention of renewal or holding over, and no language warranting the inference that this was in contemplation. There is nothing to show that George W. Riggs, who died before the expiration of that lease, understood that the security of the trust deed would follow a renewal of the lease. That he or his successors may have believed that the security would run with the occupation of the house, indefinitely, whether under a tenancy by sufferance or by new contract, can not change its tenor and legal effect, even as between the immediate parties thereto. If they did so believe, it was a mistake of law, unaided by any inequitable conduct of the lessee at the time.

It is of no importance whether the lessee subsequently, by act or word, acquiesced in or confirmed the lessor's view of the continuation of the security. Where the intent of an instrument is doubtful or obscure, a like interpretation, fairly given by the parties thereto, would certainly be potent in effect; but not so where the language is plain and affords no reasonable ground for construction. In the latter case the parties themselves are not bound, where there is no

element of estoppel; much less others who may have rights to be affected.

In this connection it may be remarked that the continuance of the insurance for the lessor's benefit did not necessarily amount to such confirmation; for the lessor could make his insurance operate as security, with the insurer's knowledge and consent, without actually encumbering the insured property. That the trust was not actually released is of no weight.

Nor is it material to consider whether the instrument of April 14, 1891, had the effect to revive the trust deed and give it force and operation against Spofford; for if that were conceded, such revival could not affect the supervening rights of others, if any there were.

The only possible effect, then, that the belief of Riggs in respect of the continuing security of the trust deed could have, would be in its bearing, if necessary, upon the question of good faith in procuring the secret security of the later instrument.

2. This brings us to the consideration of the character and legal effect of that instrument. Did it have the effect to create an equitable lien in favor of Riggs for the arrears of rent therein truthfully acknowledged to be due? We think there can be no doubt that it had.

Without any aid from the reference made therein to the former trust deed, the intent to make the arrears of rent an express charge upon the property is unmistakable. All the requirements of an equitable lien are amply satisfied. *Walker* v. *Brown*, 165 U. S. 654, 664 ; *Ketcham* v. *St. Louis*, 101 U. S. 306 ; *Dyson* v. *Simmons*, 48 Md. 207; 3 Pom. Eq. Jur., Secs. 1233 to 1237.

3. There is no contention that the last security was procured with the intent to defraud other creditors. Riggs was not aware of the other debts. He had been an indulgent creditor of Spofford, and his sole motive was to secure his own debt.

Notwithstanding the fact, therefore, that Spofford was helplessly insolvent on April 14, 1891, and had no property other than that covered thereby, his act amounted to nothing more than the preference, by a failing debtor, of one creditor to others. This, when done in good faith, is not contrary to the statute in force in this District, except when attempted as a feature of, or as one of a series of acts equivalent to, a regular assignment for the benefit of creditors. *Strasburger* v. *Dodge, ante,* p. 37.

4. We come now to the main question in the case, and the one to which the argument has been chiefly directed.

We have seen that the appellants were *bona fide* creditors of Spofford, in large amounts, on and before the execution of the equitable lien; and that they extended him credit, in smaller sums, after that date, but without knowledge of its existence. The instrument was not recorded or intended to be recorded; for it was not even acknowledged. At the time the judgment was confessed in his favor, each of the appellants had notice of the instrument.

Considering the foregoing facts, was that lien rendered invalid in respect of the claims of the appellants as creditors, accruing before and after its date, or as to the lien of their judgments, by virtue of certain provisions of the Maryland Registration Act, A. D., 1729, Chapter 8?

Sections 5 and 6 of that act read as follows:

"Sec. 5. And whereas it has often happened that several persons have heretofore secretly made over unto their creditors, or pretended creditors, or given their own children or others, sundry goods and chattels, and yet kept the same in their own possession, whereby they have been believed to be the proprietors of such goods and chattels and thereby procure to themselves credit for considerable sums of money and quantities of tobacco, to the great prejudice of several inhabitants of this province, and others, be it therefore enacted, &c., That from and after the end of this session of Assembly, no goods or chattels whereof the vendor, mort-

gagor or donor shall remain in possession, shall pass, alter or change, or any property thereof be transferred to any purchaser, mortgagee or donee, unless the same be by writing and *acknowledged* before one provincial justice, or one justice of the county where such seller, mortgagor, or donor shall reside, and be *within twenty days recorded* in the records of the same county.

"SEC. 6. *Provided always*, That nothing in this act shall extend, or be construed to extend, to make void any such sale, mortgage, or gift against such seller, mortgagor, or donor, his executors, administrators or assigns only, or any claiming under him, her or them." Compiled Stat. D. C., 230, Secs. 1 and 2.

(1) These provisions will first be considered in respect of their effect upon the rights of the appellants, as unsecured creditors, at the time of the execution of the lien. We have heretofore held that they did not render void an unrecorded bill of sale, intended as security for a debt, where possession remained with the vendor, as against an assignee for the benefit of creditors. *Colbert* v. *Baetjer*, 4 App. D. C. 416, 429.

There was no element of fraud in the transaction in that case, and it was held that the assignee was not a purchaser for a valuable consideration. He was declared to be a representative merely of the rights of the general unsecured creditors, and the question resolved itself into one of priority between them. Mr. Justice Morris, speaking for the court, said, that the debtors "had a right to make a preference in favor of creditors, and the bill of sale might well be regarded as a partial assignment, with a preference. Indeed, the present controversy might, without impropriety, be considered as a contest between two sets of preferred creditors, in which the equities in favor of those who are later in point of time have nothing whatever to commend them as superior to those of the claimants under the prior instrument."

That decision is in harmony with the great weight of

authority in England and the United States upon the construction of registration acts, some citation of which will be made later. Considered, then, merely in the light of unsecured creditors at the date of the instrument, its lien, as to them, was not lost by the failure to acknowledge and record.

(2) The next question under the statute is this: Judgments having been obtained by the appellants, with levies of executions thereunder, did the liens thereby acquired take precedence of the lien of the unrecorded instrument?

Having notice of the existence of that instrument when their judgments were confessed, we are of the opinion that their liens are subordinate, at least to the extent that those judgments represent the pre-existing indebtedness.

Unless precluded by the terms of some statute expressly intended to change it, the rule has always prevailed that the equity under a trust or a contract *in rem* is superior to that under a judgment lien. The claimant under the contract *in rem* has an equity to the specific thing which binds the conscience of his grantor; whilst the judgment creditor, who has advanced nothing on the faith of the specific thing, is entitled only to that which his debtor really has, at the time, or could honestly convey or encumber; his beneficial interest and nothing more. Adams' Equity, 149; 2 Pomeroy's Eq. Jur., Secs. 685 and 720, 721; *Brown* v. *Pierce*, 7 Wall. 205; *Dyson* v. *Simmons*, 48 Md. 207, 214; *Hartsock* v. *Russell*, 52 Md. 619, 625; American Notes, *Bassett* v. *Nosworthy*, 2 Lead Cases Eq. (4th Am. Ed.) 89 *et seq.*

That other equitable rule of priority, too, that "one who takes with notice of an equity takes subject thereto," has continued to prevail, notwithstanding the provisions of the registration laws as usually worded. Whether a mistaken view of the true policy of the application of such laws, or not, the doctrine enounced by Lord Chancellor Hardwicke, in a case arising under the registration act, 7th Anne, has been followed with great uniformity by the courts of this country. *Le Neve* v. *Le Neve*, Ambler, 436; S. C. 2 Leading

Cases Eq. (4th Am. Ed.), 109; and American Notes, 213, *et seq.*; 2 Pomeroy's Eq. Jur., Secs. 659, 660; 1 Story Eq. Jur., Secs. 397, 398; 2 Freeman Judgments, Sec. 366; 20 Am. & Eng. Encyc. L. 585; 12 Am. & Eng. Encyc. L. 111.

And in no State has the rule been adhered to more closely than in Maryland. *Hampson* v. *Edelin*, 2 H. & J. 64, 66; *Hudson* v. *Warner*, 2 H. & G. 415, 431; *Alexander* v. *Ghiselin*, 5 Gill, 138, 181; *Price* v. *McDonald*, 1 Md. 403, 414; *Johnston* v. *Canby*, 29 Md. 211, 216, 220; *Dyson* v. *Simmons*, 48 Md. 207, 214; *Hartsock* v. *Russell*, 52 Md. 619, 625; *Carson* v. *Phelps*, 40 Md. 73.

The mischief sought to be remedied by the act of 1729 aforesaid, like that of 7 Anne, was the prejudice of innocent third persons through secret conveyances and mortgages. As declared in the customary preamble of the day, the mischief was that persons would secretly convey their goods and chattels and retain the possession, *"whereby they have been believed to be the proprietors of such goods and chattels and thereby procure to themselves credit,"* to the great prejudice of others.

Some of the cases cited above arose under this same act, and will now be more particularly referred to.

*Hudson* v. *Warner, supra* (A. D. 1828), decided that the subsequent mortgagee of chattels, with notice of a prior unregistered mortgage, took subject thereto. In stating its conclusions the court said:

"The act of Assembly of 1729, Ch. 8, had for its object the suppression of secret sales. By demanding that transfers should be recorded it was intended that notice should be given that no one might be injured or deluded by secret and unknown conveyances. Its object, then, being to protect creditors from prior secret conveyances, any such creditor who had notice of such an encumbrance could not be considered as falling in the class of those for whose benefit the act was passed; for when he had notice how could he be considered as injured by the conveyance? We can not give

the act the narrow construction which seems to be contended
for, that no notice was sufficient to gratify the law, but such
as was derived from the registry of the deed; for such a con-
struction would invalidate transfers which, it is obvious from
the general tenor of the act, it was not the purpose of its
framers to disturb or interfere with. Any other kind of
notice of the transfer which demonstrates the existence of a
lien or the transfer of a right brought home to the party
who seeks to avoid such lien or transfer, will be sufficient."

In *Alexander* v. *Ghiselin, supra,* a party had a mortgage
upon land, and, to enable the mortgagor to borrow money
thereon, surrendered her priority upon his promise to give
her a new mortgage upon certain personal property. This
mortgage was not executed, and meanwhile certain judg-
ments were obtained against the mortgagor and executions
thereon were levied upon the same property. At her suit
the priority of her equitable mortgage or lien was decreed,
and an injunction ordered restraining the execution sales.
The views of the court were thus expressed by Judge
Chambers:

"It is said, however, that the registry acts and particu-
larly the act of 1729, Ch. 8, make it void as against
creditors. This objection goes to the whole extent of the
position that an equitable mortgage can not be enforced
except against the contracting party. No exception is
made in the act, the terms of which are broad enough to
defeat a *bona fide* purchaser who paid his money on the
faith of a legal transfer or security to be forthwith executed
if the rights of a creditor should happen to intervene,
although the creditor has full notice of the transaction.
There certainly is great difficulty in any general legislation
on the subject to avoid individual cases of serious hardship.
The manifest injustice and oppression which a rigid execu-
tion of these registry acts according to their letter would
occasion has led courts of equity to construe them as they
have the statute of frauds, in a way to avoid many of the

12 Ct. App.—25

inconveniences and injuries which a literal interpretation would inflict. How far in the aggregate the benefits of such, a construction exceed the mischiefs it is not in the province of this court to decide. Wise and experienced jurists have differed in their opinions as to which would have been the more judicious course. All, however, agree that a literal construction was not adopted, and to abandon at this period the precedents of all past time would be to unsettle titles to property, destroy an entire system of chancery jurisprudence, erected upon the supposed equity of these laws and matured with the concurrence of many legislative enactments, and throw doubt and confusion over a large and important branch of the law, most intimately affecting the rights of every species of property.

"Certainly it would be a novel doctrine in Maryland to assert that the chancery court can not specifically execute a contract for a mortgage or other equitable lien against creditors. The rule that equity regards as done that which was agreed to be done was imported with other parts of the system by our ancestors. The instances in which it has been enforced, and against the very terms of the registry acts, are numerous."

In *Gill* v. *Griffith*, 2 Md. Ch. 270, a case much relied on by the appellants, the debtor gave to his creditor as many as thirteen renewals of a chattel mortgage, each new one being made within twenty days of the date of its predecessor, and withheld from record to prevent the mortification that would ensue to the mortgagor, from the public knowledge that he had encumbered his household property. As against the beneficiaries of a trust fund that came into the mortgagor's hands during the time of those mortgage renewals, they were declared void. In coming to that conclusion, however, the chancellor admitted " that when actual notice can be traced to the subsequent creditors and purchasers, the object of the statute is attained, and a literal compliance with its language need not be insisted upon." The grounds of that decision will be again referred to.

Although the construction given to this act in Maryland was not enounced by any court thereof, so far as we are advised, before the cession of this District, it has been so long established, has remained so long unquestioned and is so in accord with the current of decisions elsewhere, construing similar statutes, that we are constrained to accept it as final and give it effect.

(3.) As regards the credits given to Spofford after the date of the instrument, and without knowledge of its existence, we are of the opinion that they take precedence of its lien. Under the statute the lien of the unrecorded instrument is void as to creditors dealing with Spofford on the faith of his ownership of the property encumbered thereby. *Colbert* v. *Baetjer*, 4 App. D. C. 416, 425.

In all cases, probably, such credits would be presumed to have been given, in part at least, upon the faith of the ownership of property apparently unincumbered. Whether this be true or not, is of no importance in this case, because it can be readily inferred from the evidence that the appellants would not have continued to extend credit to Spofford had they been informed of his execution of that instrument.

In such a case, the law, for the protection of innocent givers of credit, intervenes, and without regard to the intent with which the instrument may have been withheld from record, avoids it to that extent. See *Gill* v. *Griffith, supra.* In that case, the trust funds which were the subject of the plaintiff's claim, had come into the mortgagor's hands during the time that he was trying to keep his secret mortgage alive by the constant renewals; and their receipt would not have been permitted had his condition been known. The decision goes no further than that, and hence, instead of being opposed to, is reconcilable with, the decisions of the Court of Appeals of Maryland heretofore cited in support of the validity of the lien as against the pre-existing debts.

It is not necessary to the protection of the subsequent creditors that they shall have acquired liens by judgment or otherwise, before acquiring notice of the unrecorded lien.

They stand, in respect of their rights under this statute, as do prior creditors under the statute against conveyances to defraud creditors. Reduction to judgment is only necessary as a foundation for their relief in equity.

(4) Our attention has been called to the fact that when the executions were levied in this case the twenty days' limitation of the recording act had not expired.

No doubt the instrument would be regarded as valid throughout the twenty days given for the record, provided it is in the condition to be recorded, and has not been purposely withheld from record in order to accomplish some unlawful end. This instrument was not acknowledged so that it could be recorded.. The statute requires both. There is no occasion to inquire why the acknowledgment was omitted, or why its record was not contemplated. Not being acknowledged, or intended for record, the time given by the statute can not apply in its favor.

We are of the opinion, therefore, that there was error in the decree in so far as it failed to recognize the priority of the claims of the appellants, respectively, to the extent of their credits given on and after April 14, 1891.

5. That the confessed judgments included both the prior and subsequent indebtedness is a matter of no consequence, now that the case is in a court of equity.

The two classes can be readily separated in determining the priority of the liens. The testimony in the case of the appellant Hume shows clearly the amount of his later credits. To ascertain Daly's will probably require reference to the auditor. When that is ascertained, the priorities of the liens of the several parties may be decreed in the following order:

(1) The landlord's lien for three months' rent given by statute. R. S. D. C., Sec. 678.

(2) The amounts due each of the appellants for credits given to Spofford on and after April 14, 1891.

(3) The remainder of the rents secured by the lien.

For the reasons given the decree appealed from will be reversed, with costs, and the cause remanded for such further proceedings as may be necessary, and for final decree not inconsistent with this opinion.

*Reversed and remanded.*