RICHARD W. GILL,
TRUSTEE OF
ELIZA McK. DUNCAN & ANN McK. HANDY,
JOHN M. DUNCAN,
AND THE SAID ELIZA, HIS WIFE, AND          } MARCH TERM, 1848.
SAML. J. K. HANDY, AND THE SAID ANN, HIS WIFE
VS.
ISRAEL GRIFFITH AND WILLIAM SCHLEY.

[VACATING DEED OF CHATTELS—REGISTRATION OF MORTGAGE—ACTS OF ASSEMBLY.]

S., on the 22d of March, 1845, mortgaged all his personal estate to G., to secure the latter against a liability of $6000, incurred on his account. G. did not record this mortgage, but at the request of S. and in order to gratify him in the desire to avoid the discovery of his temporary embarrassments, kept it from record, and caused it to be renewed from time to time, at periods usually within 20 days, until the 4th of June, 1846, when hearing of the extent of S's liabilities, and believing the enrollment thereof necessary for his security, he caused the last renewal to be recorded on the 18th of the same month in which it was executed. During this time, S. remained in possession of the property, and no new consideration passed from G. to him after the 4th of September, 1845. Between the 3d of January, and the 25th of November, 1845, S., as trustee of the female complainants, received large sums of the trust funds, of which $12,000, were received by him in the months of October and November, 1845. This money not having been invested, and S. failing to bring the same into court in compliance with an order passed on the 29th of June, 1846, another trustee was appointed in his place, who, on the 24th of July, following, caused writs of *fieri facias* to be issued upon said order against S., which were defeated by the above mentioned mortgage. The complainants then filed their bill to vacate this deed as either fraudulent in fact, or as void constructively, by reason of the provisions of the registration acts, HELD—

That a party cannot be permitted to take a bill of sale, or mortgage of chattels from another, for his own security, leave the mortgagor in possession, and ostensibly the owner, and at his request, and to keep the public from a knowledge of its existence, withhold it from record for an indefinite period, renewing it periodically, and then receive the benefit of it by placing the last renewal upon record, to the prejudice of others, whom the possession and ostensible ownership of that very property by the mortgagor, have induced to confide in him.

That, as no new consideration passed between the parties since the mortgage of the 4th of September, 1845, all the mortgages executed since then, are mere renewals or continuations of the one executed on that day, and viewed in this light, the registration, on the 18th of June, 1846, was not in time. This mortgage, therefore, falls within the express terms, as well as spirit of the act of 1729, ch. 8.

If this deed could now be recorded under the 11th section of the act of 1785, ch. 72, it cannot, by the express terms of that act, in any manner affect the rights of the creditors of the party making it, who became such, after the date thereof.

As the object of the act of 1729, ch. 8, was to protect creditors from prior secret conveyances, any such creditor who had notice of such conveyance, cannot be considered as falling in the class of those for whose benefit the act was passed.

By the act of 1729, it was intended, that speedy information should be given to every person of any transfer of personal property, when the party transferring retained the possession ; and that such possession, unless the deed was acknowledged and recorded as therein provided, of itself, as to creditors and subsequent purchasers, defeated the first conveyance.

The manifest design of the legislature to give the public notice, not only of the existences of incumbrances on estates, but of the precise amount thereof, is shown by the act of 1825, ch. 50. And the same wise policy is still further displayed by the 2d section of the act passed the same year, ch. 203.

Though the legislature has changed the law with regard to the registration of deeds, or conveyances of real estate, by the acts of 1825, ch. 203, section 1, and the act of 1831, ch. 304, it has never, in any respect, modified the act of 1729, to prevent secret sales, mortgages, and gifts of goods and chattels, of which the vendor, mortgagor, or donor, should remain in possession, but these have continued exposed to the stern but wholesome provisions of that act.

All the decisions of the courts upon the act of 1729, and all subsequent legislation, concur in condemning the attempt made in this cause, to evade the legislative will in regard to the transfers of the title to personal estate.

———

[THE bill was filed in this case by R. W. Gill, as trustee of Mrs. Duncan and others, and by Mrs. Duncan and other *cestui que trusts*. After showing that W. Schley, as a duly appointed and qualified trustee for Mrs. Duncan and the other *cestui que trusts* therein named, was, as such trustee, decreed to bring into the Court of Chancery the sum of money therein named, and his failure to do it, the bill then avers his removal from the trust, the appointment of Gill, the complainant, as trustee in his stead, and the issuing of writs of *fieri facias* on said decree to the sheriffs of Baltimore, Frederick, Washington and Alleghany counties. It then shows the direction to the sheriff of Baltimore, to levy the said writ, in his hands, on certain goods, &c., in the use and possession of Mr. Schley, and the refusal of said sheriff to levy as directed, alleging as his excuse, that said goods were included in a mortgage of the

same, executed by said Schley to Israel Griffith, dated 4th June, 1846, and recorded 18th June, 1846, and that thus complainant's remedy under said writ failed. It avers, also, a levy under said writ to Alleghany, on certain lands mortgaged by Schley to Griffith, by deed of 21st April, 1845.

After averring the utter insufficiency of the property taken, or liable under all the said writs issued, to pay the debt, and the insolvency of Schley, it then charges that Griffith, at the period of both mortgages, knew that Schley was embarrassed and insolvent, and now knows that all his property will not pay the decree above mentioned; and that the deeds above mentioned illegally and unjustly hinder and embarrass the collection of said debts. It also charges an unlawful agreement between the parties in the original agreement for said mortgages, that they should not be put upon record according to law, and that it was intended and designed between them, that these mortgages, and each of them, should be kept secret, and that the said mortgagor should keep possession of the property conveyed by them, so that he might be believed to be the proprietor thereof, to the great prejudice of these *cestui que trusts*, and that having thus agreed, the said mortgagor, on or about the 21st of April, 1845, executed two mortgages, one for the land in Alleghany, which is above referred to, and another for the property in Baltimore, similar, or nearly, to that above referred to, and which is in possession of Griffith. It then states, that Griffith put the Alleghany mortgage on record about a month after its execution, but that the mortgage for the property in Baltimore was not put on record, but was kept in the private and secret possession of Griffith, or kept from being recorded with his knowledge, and from time to time renewed or re-executed between the 21st April, 1845, and 4th June, 1846, and calls for these renewals, as within Griffith's knowledge.

It also charges, that when the said mortgage for the property in Baltimore was first made, it was secretly made, when Griffith was but a pretended creditor, and had not made any advances or incurred any responsibilities, and that it was designed

by and kept from record, whilst the property remained in the possession of the mortgagor, and was believed to be the proprietor of it, and that during this period the mortgagor received large sums of money belonging to the complainants; that it was kept from record by a secret agreement against the policy of a public law, and was therefore fraudulent and void in its origin, as also in its illegal and fraudulent renewals; and, also, that said mortgage of June, 1846, is a fraud upon the registry acts, as also upon the act to limit the effect and operation of mortgages; and it avers a similar, secret and fraudulent agreement as to the Alleghany deed, and that it was recorded contrary to said agreement, but was still vitiated by the fact of its being made under such agreement. The bill also contains other statements and charges, none of which, however, are material to an understanding of the chancellor's opinion.

The answer of Griffiith admits the appointment of Schley as trustee, his receipt of the trust funds, an order on him to bring them in, his removal for failure in this, and the appointment of Gill as trustee, in his stead, and also the issuing of the writs of *fieri facias*, as alleged in the bill, the direction to the sheriff of Baltimore county to levy on the goods in Schley's possession, and his refusal as alleged in the bill, and also the levy on the Alleghany lands, and also the mortgages to this defendant, as stated in the bill.

He also admits, that Schley is now reputed to be unable to pay his debts, but he has no such knowledge as to enable him either to admit or deny his insolvency. He admits, as very probable, that Schley's visible property, including that conveyed to him, would not pay the complainant's executions; but denies that at the time of advancing the moneys, and giving the liabilities designed to be secured by the said mortgages, he knew or suspected, or had reason to know or suspect, that he, Schley, was insolvent, or so embarrassed and unable to meet his engagements, as to render it improper, or hazardous for him, Griffith, to aid him with money or credit, and on the contrary, believed the assistance he gave, would have given him, Schley, sufficient funds to relieve him from all embar-

rassments; that under this belief, he advanced, and indorsed for Schley, and continued to give him facilities, and had no information as to the actual extent of Schley's liabilities until the 18th June, 1846.

He further denies, that there was any confederacy or agreement between him and Schley, at the time of the original agreement therefor, or at any time thereafter, that the mortgages, or any of them, should be withheld from record or kept secret, or that he, Schley, should keep possession, so as to be believed to be the proprietor, or for any purpose of bolstering up Schley's credit; or that he was under any sort of obligation to keep the mortgages, or any of them, from record for a moment longer than it suited his interest, convenience or pleasure, or that he was aware of any motive on the part of Schley for keeping them from record, except the natural desire of avoiding the publication of the fact that his household goods were under mortgage, and also denies the knowledge of the existence of any state of circumstances, making it at all probable that the failure to record them, might occasion injury or loss to any one.

He then states, as explanatory of the origin of his claim, and the motive for keeping it from record, that he had previously lent Schley money, which was punctually returned; that on the 6th March, 1845, Schley owed him $2,500, on his note, indorsed by one Kemp, and $750 cash lent, on the day before. That on or about said 6th of March, Schley applied to him for a loan of his name, as indorser on Schley's note for $10,000, to be discounted for Schley's accommodation : that for the reasons he states, he, Griffith, in part acceded to the proposition, and on that day, indorsed three notes of Schley's for $2,000 each, dated on that day, and payable at sixty days, four months and six months, which were taken by him, Griffith, at Schley's request, to the Bank of Baltimore, there discounted, and the proceeds paid to him in Schley's presence : and that he, Griffith, after deducting the cash loan of $750, paid Schley the balance at the counter of the bank, and that as part of this arrangement, Schley engaged, in writing, to assign, and on the

same day did assign to him, Griffith, his life policy with the Baltimore Life Insurance Company, and also executed to him, under said agreement, the two first mortgages alluded to in the bill. He further states, that he did not record these mortgages, because of the confident expectations expressed by Schley, and believed by him, that the notes would be retired at maturity, and from his, Griffith's, belief that he could, without risk to himself, or injury to any one, gratify the wish expressed by Schley, that they should not be recorded until there had been some default on his part: but he denies any agreement between them then, or before, or thereafter, to withhold them from record, or keep them secret, or that he knew or suspected that Schley had any other motive for desiring this, except that of avoiding the mortification arising from the discovery of his temporary embarrassments, and that his confidence in Schley's character and professional attainments assured him, that there could be nothing connected with Schley's pecuniary situation to make it improper for Schley to ask, or improper or hazardous for him to grant it; that he believed the aid he then gave would relieve Schley from pressure, and had not the most distant cause for suspecting that Schley desired them to be retained, to sustain unduly his credit.

He further admits, that on the 16th of April, 1845, the bill of sale was renewed; that on the 21st of April, 1845, at Schley's instance, he indorsed for Schley two other notes, for $2000 each, at six and eight months, for which Schley gave him a mortgage on his Alleghany lands, which he soon after put upon record as he had a right to do; and that supposing Schley's request was chiefly prompted by his great desire to keep the bill of sale of his personals from record in the city where he resided, he would sufficiently gratify him by keeping this from record, as he did until June, 1846, when he first heard of the extent of his embarrassments, and believed the enrollment necessary.

He further states, that on the 4th of September, 1845, Schley wanted further aid, and that he, still confiding in his perfect and undoubted solvency, and actuated only by his friendship for Schley and desire to extricate him from his embarrassments,

which he believed to be limited, then cashed Schley's note for $2000, at two months, and his draft on F. A. Schley, at four months, for $2000 more, and agreed to retire, and did retire the previous note at six months, given in March before, which he now holds. He further states, that on the said 4th of September, Schley prepared for execution a renewed mortgage of the Alleghany lands, and another renewal of the bill of sale, but that on his suggestion it was agreed that there should be no further mortgage of the Alleghany lands, and that the bill of sale should be, as before, with the additional statement of the September transactions, and, therefore, the bill of sale thus corrected, was renewed on the 4th and 24th of September, 17th of October, 7th and 26th of November, and 16th of December, 1845, and on the 7th and 27th January, 21st of February, and 12th March, 1846 ; that having no skill in such matters, he confided the proper preparation of these instruments to Schley, and believes that Schley thought them sufficient, and had no motive for giving false color to the transactions, or misrepresenting the amount due ; that discovering an inaccuracy in the latter renewals, in requiring payments of past due notes, this was corrected in the further renewals, which were made on the 31st March, 22d of April, 12th of May, and 4th of June, 1846. And he states that on the 18th of June, 1846, being then first informed, and by the complainant, S. J. K. Handy, of Schley's great defalcation as trustee, and then first made sensible of his risk, he at once, and without consulting Schley, placed it on record before the execution of the complainants' writ, or the order on which it was issued, passed. He denies any knowledge of Schley's receipt of the trust funds, or even that he was trustee, before the 18th of June, 1846, when told by Handy, and also denies the receipt of any of the trust funds to his knowledge.]

THE CHANCELLOR:

This case has been argued before me by counsel, and now comes up for decision.

It appears by the proceedings, that on the 20th of December, 1844, the defendant, Schley, was, by the order of this court, ap-

pointed trustee to receive and invest certain sums of money, then under the control of the court, belonging to Ann McKim Handy and Eliza McKim Duncan ; and that having qualified by giving the bond required by the Chancellor's order, he did receive, at various periods, commencing on the 3d of January, 1845, and terminating on the 25th of November of the same year, the sum of thirty thousand eight hundred and thirty-two dollars; of this amount upwards of twelve thousand dollars were received in the months of October and November, 1845. The money not having been invested, and the said Schley having failed to bring the same into court, in compliance with an order to that effect, passed on the 29th of June, 1846, the complainant Gill, was, on the 6th of July, 1846, appointed trustee in his place, and duly qualified by giving bond as such, and, thereupon, he caused writs of *fieri facias* to be issued upon the order against Schley, on the 24th of July, 1846, directed to the sheriffs of Baltimore, Alleghany, Washington and Frederick counties ; which writs were received by the sheriffs, but were ineffectual, for the reasons stated in the bill.

It further appears, that on the 22d of March, 1845, the defendant, Schley, for the purpose of securing the defendant, Griffith, against a liability incurred by the latter, on account of the former, to the amount of six thousand dollars, conveyed to him, by way of mortgage, the personal property of the grantor, of every description in the city of Baltimore, and a tract of land in Alleghany county, with conditions that the conveyances should be void, in case Schley should pay at maturity the notes which Griffith had indorsed for him. Afterwards, on the 21st of April in the same year, a new mortgage of the land in Alleghany county was given, in which it was recited, that in addition to the three notes for $2000 each, mentioned in the original mortgage, Griffith, the mortgagee, had, on the day of the execution of the last mortgage, indorsed two other notes for $2000 each, for the accommodation of Schley, and that this last mortgage was given to secure the payment of all the notes.

The two first mortgages though duly executed and acknowledged, were not recorded ; but the last mortgage of land in

Alleghany county, was recorded on the 27th of May, 1845. It also appears, that the mortgage of the personal estate of Schley was not recorded, but was renewed from time to time, at periods generally within, but occasionally after an interval of more than twenty days, from the 22d of March, 1845, to the 4th of June, 1846, which last mortgage executed on that day · was recorded on the 18th of the same month and year.

The state of the account and the amount of the liabilities of the defendant Griffith, for the defendant Schley appears to have fluctuated from the origin of this transaction, in March, 1845, to the 4th of September of the same year, but no new responsibility seems to have been incurred after this latter period, and in the last mortgage of the 4th of June, 1846, all of the notes indorsed by Griffith, at different times up to, and inclusive of, those indorsed on the 4th of September, 1845, are recited and secured to be paid.

The plaintiff in his bill alleges, that it was a part of the original agreement of these parties, mortgagor and mortgagee, that the instruments in question should not be put upon record, but that they should be kept secret, and yet that the mortgagor should retain possession of the property, to the end that he might be believed to be the owner thereof, to the great prejudice of the said *cestui que trusts*.

The answer of the defendant, Griffith, upon this point, denies that the deeds were withheld from the record, in consequence of any agreement between Schley and himself, or for the purpose of keeping the existence of them secret, or that he, the defendant, knew or suspected, that Schley had any reason for desiring that they should not be recorded, other than the natural desire of avoiding the mortification of discovering one's temporary embarrassments to the society in which he daily moved, and he averred, that his confidence in the integrity and professional attainments of said Schley, assured him, that there could be no circumstance connected with his pecuniary condition, to make it improper in Schley to make, or that respondent to grant his request in this respect.

The answer then speaks of the execution of the new mort-

gage upon the land, in April, 1845, and of the enrollment there-of, which the defendant avers he caused to be made in the exercise of his legal rights, he supposing the request of Schley was chiefly prompted by his great desire to keep the bill of sale of his personals from the records of the city, in which he resided, and he presumed he would gratify the said Schley sufficiently by retaining said bill of sale from record, which he did accordingly, until the month of June, 1846, when he learned, for the first time, of the extent of said Schley's embarrassments, and had cause to believe that the enrollment thereof was necessary.

This answer, then, whilst it denies any agreement between the parties, or obligation on the part of Griffith to keep the bill of sale from the record, admits the request of Schley, that he should do so, and his assent to or acquiescence in that request until the exigency arose, when, in his judgment, his own safety depended upon his placing the instrument upon the records for public information.

The bill of sale of the personal estate, it has been already remarked, was renewed from time to time, within periods usually within, but occasionally running a little over twenty days from the first in the series, dated the 22d of March, 1845, until the last, of the 4th of June, 1846. And further, that no new consideration passed from Griffith to Schley, or new or super-added responsibility was incurred by him for Schley's accommodation, subsequently to the 4th of September, 1845, and that, consequently, the several instruments executed since that date, are simply renewals of the one then executed.

It has been conceded, and indeed cannot be denied, that the complainants have a standing in court to impeach these conveyances, and if they, or either of them, is void for any reason, there can be no doubt they are entitled to a decree for the sale of the property contained in them, to satisfy the claims, which, by the decree of this court, has been established against Schley, they having, in case these instruments are void, acquired a lien upon this property, by the proceedings adopted by them to enforce the payment of the decree.

The bill in this case is filed by Gill, the trustee, and the *cestui que trusts,* and their husbands, and prays for appropriate relief.

This relief is claimed upon two grounds : 1st, that the deeds are fraudulent in fact ; and 2nd, if not void upon the ground of fraud in fact, they are so void, constructively, by reason of the provisions of our registration acts.

With regard to the mortgage of the real estate in Alleghany county, I do not think the efforts of the complainants to impeach it have been successful. The original mortgage, which, with the bill of sale of cotemporaneous date, was designed as a security to indemnify Griffith, from the responsibility then assumed by him on Schley's account, was executed upon a good and valuable consideration ; and the second mortgage of the real estate, of the 21st of April of the same year, was executed, not only to secure the mortgagee from the liabilities previously existing, but also, from a superadded responsibility of four thousand dollars subsequently incurred. This last mortgage was enrolled on the 27th of July of the same year, within little more than one month of its date, and having been thus duly executed, acknowledged and recorded, must be regarded as a valid instrument, unless it can be impeached upon the ground of fraud in fact. It seems, that in the original mortgage of the 22d of March, 1845, there was an error in the recital, in regard to the discounting of the notes ; that mortgage reciting, that they were discounted by Griffith, when, in point of fact, they were discounted at the Bank of Baltimore. This error is corrected in the second instrument, and an additional consideration stated, to wit, the indorsement by Griffith of two other notes of $2000 each. This second mortgage appears to have been executed for the double purpose of correcting this misrecital, and securing Griffith against this accumulated responsibility.

I have not, from a careful view of the testimony and an attentive consideration of the arguments of counsel, been brought to the conclusion that there was any fraud, in fact, in the execution of this mortgage of April, 1845 ; my impression

is, that the money raised upon the notes was received by Schley, and was used by him, and I have not been able, in the face of the answers, to find any testimony of an agreement to withhold this instrument from the public record. And the fact, that it was enrolled by Griffith, without the consent of Schley, is cogent evidence, not only against any such agreement, but any aquiescence on his part in the request of Schley, that it should not be so enrolled. For these reasons thus briefly stated, I am of opinion, that the plaintiffs have not been successful in impeaching that deed.

But, in my opinion, the bill of sale is liable to very different considerations.

It has been renewed, as we have seen, from the 22d of March, 1845, to the 4th of June, 1846, and no new consideration moved from Griffith after the 4th of September, 1845. Every new instrument executed subsequently, and there were no less than thirteen, have been neither more nor less than simple renewals of that deed, and this contrivance has been resorted to, for the avowed purpose of keeping from the citizens of Baltimore, a knowledge of the fact, that Mr. Schley's "household goods were mortgaged." It was, as the defendant Griffith declares, to gratify Schley, in the very natural desire of avoiding the mortification of discovering to the society in which he moved, his temporary embarrassments. It is true, the defendant also says, he had not the most distant cause for suspecting, that the retaining of said papers in his possession, was desired by Schley, for the purpose of advancing any pecuniary speculations, or sustaining unduly his credit, and he expressly denies any agreement with Schley upon the subject, but he does admit, that he did withhold the instrument from the record, to gratify Schley in his desire to keep his fellow citizens in the dark in regard to his situation, and that he continued to act in accordance with this expressed desire, until he was led to believe, that his security required him to pursue a different course.

Independently of authority, nothing strikes the mind with more force, than that if one of two innocent persons must suffer,

25*

the loss should fall upon that one whose act has occasioned the calamity. Now, can there be a reasonable doubt, that the act of the defendant, Griffith, in gratifying the defendant, Schley, in what is called a natural desire of avoiding the mortification of having the condition of his affairs exposed to the knowledge of the citizens of Baltimore, has caused a heavy loss to the complainants, Mrs. Duncan and Mrs. Handy? Upwards of twelve thousand dollars of this trust money was received by him, in the months of October, and November, 1845, when the probabilities are very strong, if the desperate condition of his affairs, as disclosed by these mortgages, had been known, steps would have been taken in time to prevent the receipt of the money by him. The object of Griffith, as he says, was to gratify Schley in this very natural desire, but surely he had no right to indulge himself in this way at the expense of third persons. If he must indulge Mr. Schley in such desires, it would seem to be no more than even handed justice, that he should do so at his own risk.

The point presented, then, by this record, so far as this personal property is concerned, is this, can a party be permitted to take a bill of sale, or mortgage of chattels from another for his own security, leave the mortgagor in possession, and ostensibly the owner, and at his request, and to keep the public from a knowledge of its existence, withhold it from record for an indefinite period, renewing it periodically, and then receive the benefit of it by placing the last renewal upon the record when impelled by considerations affecting his own safety, and to the prejudice of others whom the possession and ostensible ownership of that very property by the mortgagor may have induced to confide in him.

Such certainly should not be the law, and nothing short of the most controlling authority would induce me so to decide. This is not a case, it is to be borne in mind, in which the omission to record the deed was the result of accident or mistake, but the case of a wilful and deliberate purpose, persevered in for more than fourteen months; a purpose at war, as I conceive, with the letter and spirit of the registration laws, and a

purpose not abandoned until warned by one of the sufferers, that the very thing had happened which might, and would probably, to a considerable extent, have been avoided, if there had been no attempt to evade the salutary provisions of these laws.

Chancellor Kent in more than one instance denounces these concealments. He says, in the case of *Hildreth* vs. *Sands*, 2 *Johns.*, *Ch. Rep.*, 35, that a deed not at first fraudulent, may afterwards become so by being concealed, or not pursued by means of which creditors are drawn in to lend their money. And in *Wendall* vs. *Van Rensellear*, 1 *Johns. Ch. Rep.*, 353, he adjudged a deed to be void, because it was carefully concealed from the knowledge of the world, by which means, false colors were held out to the world, and the public were permitted to consider the property as belonging to the grantor, and to treat with him as the absolute owner.

Nothing seems to me more plainly sanctioned by the principles of equity, than that a man should not only be responsible for the direct effects of his acts, but likewise for all the consequences which may naturally and reasonably be expected to flow from them, and that nothing can be more natural and reasonable than that injurious consequences will flow from permitting the title in property to be in one, whilst all the visible evidences of ownership are in another, without the existence of any authentic memorial to inform the public who have only appearances to guide them, that these visible manifestations of ownership are not to be relied upon. These are the false colors of which Chancellor Kent speaks, and it was to prevent their exhibition, so full of deceit to the public, that our registration laws were passed.

Before adverting to them, briefly, it may not be out of place to remark, that Mr. Griffith attempts in his answer to excuse himself for not putting these deeds on record properly, by saying, that he had no such knowledge of Mr. Schley's affairs until the 18th of June, 1846, as induced him to suppose that injury was likely to result to the public from his omission to do so. In reply to this, it may be said, that there was abundant evi-

dence before him, to be found in Mr. Schley's applications to him for pecuniary aid, that his circumstances were, to say the least, in the most distressing condition of embarrassment.

But, it seems to me, that apart from considerations drawn from the conduct of Mr. Griffith in designedly withholding this deed from the public records, avowedly to gratify the wish of Mr. Schley, to keep from the community in which he lived the knowledge of its existence, there is quite enough to condemn it with respect to these complainants.

I cannot but think it falls within the express terms as well as spirit of the act of July session, 1729, ch. 8, "for the relief of creditors, and to prevent frauds and deceits occasioned by secret sales, mortgages, and gifts of goods and chattels." The 5th section of that act declares, that "no goods or chattels, whereof the vendor, &c., shall remain in possession, shall pass, alter, or change, or any property thereof be transferred to any purchaser, &c., unless the same be by writing, and acknowledged before one provincial justice, or one justice of the county where such seller, &c., shall reside, and be within twenty days recorded in the records of the same county." Here the goods did remain in possession of the mortgagor, and the mortgage was not recorded as required by the act, and, therefore, it would seem to follow, that the title did not pass.

It is said, however, that the mortgage of the 4th of June, 1846, was recorded in time, and that being so recorded before the complainants acquired any lien upon the property conveyed, the title must stand. But this is not my understanding of the effect of these instruments. We have seen that since the mortgage of the 4th of September, 1845, no new consideration of any description has passed between these parties, and I cannot but regard all the mortgages executed since then as mere renewals, or continuations of that which was executed on that day. Viewed in this light, the registration was not in time, and conceding, for the sake of the argument, that this mortgage though purposely and by design kept from the record, might now be recorded under the provisions of the 11th section of the act of 1785, ch. 72, it cannot, though now ordered to be re-

corded, by the express terms of that act, "in any manner affect the creditors of the party making such deed, who may trust such party after the date of said deed." And as the party making this deed became indebted to these complainants in a sum exceeding twelve thousand dollars after the 4th of September, 1845, it follows that they are not to be affected by it.

This, however, is not an application to record the deed of the 4th of September, 1845, but the party claiming under the last renewal of that deed, insists, that by the recording of this latter instrument, he is to be dealt with as if he had in all respects complied with the act of 1729.

The case of *Pannel and Smith* vs. *The Farmers Bank*, 7 *Har. and Johns.*, 202, shows the views entertained by a former Chancellor of this court, upon the act of 1785, ch. 72, in reference to a decree ordering a deed to be recorded, which had not been recorded in time, upon the rights of subsequent purchasers and creditors.

The Court of Appeals, in the case of *Hudson* vs. *Warner and Vance*, 2 *Har. and Gill*, 415, decided, that as the object of the act of 1729, ch. 8, was to protect creditors from prior secret conveyances, any such creditor, who had notice of such conveyance could not be considered as falling in the class of those for whose benefit the act was passed, and as Hudson, in that case, had actual notice, though the deed was not recorded, he was not to be regarded as an injured creditor, within the meaning of the act.

But in this case, there is no pretence of actual notice, and the pleadings show, that there was a fixed design, persevered in for more than twelve months, to prevent actual, or constructive notice from being communicated to the public, of the existence of this deed. Whatever may have been the cause for this, whether the result of an agreement, promise, or mere acquiescence in the expressed request of the mortgagor, and to save his feelings from mortification, it is so clearly repugnant to the letter and policy of the legislature, that it seems to me impossible it can escape condemnation.

It has been argued on the part of the defendant, Griffith, that

a deed or mortgage of personal estate, whereof the vendor, or mortgagor remains in possession, is not void by construction of law, even though it be not recorded in time, and that this position is shown to be sound, by referring to the 11th section of the act of 1785, ch. 72, which, under the circumstances mentioned in the act, authorizes the Chancery Court to order such deed to be recorded. But this power, by the provision of the section, cannot be executed to the prejudice of subsequent creditors and purchasers, and, therefore, the failure to record, as required by the act of 1729, would, looking alone to the language of the act, seem to be conclusively fatal.

Such a deed may nevertheless be valid, notwithstanding the omission to have it recorded, as has been shown by the case of *Hudson* vs. *Warner and Vance*, when the object sought to be attained by the legislature has been accomplished in some other way. Show that the party complaining has actual notice, that is, that as to him, it is not a secret conveyance, and his objection will not be attended to. Give a party actual notice, and in the language of Mr. Justice Story, his conscience is bound, whilst the operation of the registration acts, is only to bind the title. 1. *Story. Eq., section* 401.

All the decisions of the courts upon the act of 1729, and all subsequent legislation, concur, in my judgment, in condemning this attempt to evade the legislative will, in regard to the transfers of the title to personal estate. The possession of such property, as is known, carries with it much more forcible evidence of title, than the possession of real estate. It passes by delivery, and its rapid transfer from hand to hand, is indispensable to the operations of commerce. Hence the time for recording deeds of personal estate is limited to twenty days.

The manifest design of the legislature to give the public notice, not only of the existence of incumbrances on estates, but .of the precise amount of such incumbrances, is shown by the act of 1825, ch. 50, to limit the operation and effect of mortgages. And the same wise policy is still further displayed, by the second section of the act passed the same year, chapter 203. And it is also to be observed, that though the legisla-

ture has changed the law with regard to the registration of deeds of conveyances of real estate, giving, by the first section of the act of 1825, ch. 203, a preference to that deed which shall be first recorded according to law, over deeds subsequently recorded, and by the act of 1831, chapter 304, authorized the recording of deeds at any time, except deeds of mortgage, and giving effect, to a certain extent, to deeds so recorded.   The law-making power, seems never to have modified, in any respect, the act of 1729, to prevent secret sales, mortgages and gifts, of goods and chattels, of which the vendor, mortgagor, or donor, should remain in possession, but these have continued exposed to the stern, but, in my judgment, wholesome provisions of that act.

In the case of *Hambleton* vs. *Hayward*, 4 *Har. and Johns.*, 443, the Court of Appeals said, by the act in question, it was intended that speedy information should be given to every person, of any transfer of personal property, where the party transferring retained the possession, and that such possession, unless the deed was acknowledged and recorded *of itself*, as to creditors and subsequent purchasers, defeated the first conveyance.   Such has been the uniform language of the courts, the only qualification to it being, that when *actual notice* can be traced to the subsequent creditors and purchasers, the object of the statute is attained, and a literal compliance with its language as to them need not be insisted upon. *Dorsey* vs. *Smithson*, 6 *Har. and Johns.*, 61 ; *Clary* vs. *Frayer*, 8 *Gill and Johns.*, 398 ; *Byer* vs. *Etuyre and Besore*, 2 *Gill*, 151.

In view of these legislative provisions, and the repeated decisions of our courts upon the subject, all concurring to show the indispensable necessity of giving publicity to transactions like the present, it seems to me to be impossible, to sanction the course adopted by these defendants, with regard to this bill of sale.

If such an instrument may be renewed for one year, it may be for twenty, during all which time the mortgagor, being in possession, is the apparent owner, and is dealt with and trusted as such, whilst the actual ownership is elsewhere, and this la-

tent title is ready, at any time, to be interposed, when the creditors, deluded by the act of the party holding it, have re- course to the courts, for the recovery of their claims.

Entertaining these views, a decree will be signed, vacating the mortgage of the personal estate of the 4th of June, 1846, and appointing a trustee for the sale of the property contained in it, for the payment of the claims of the complainants.

The same decree may, if the parties desire it, direct a sale of the lands in Alleghany county, for the satisfaction of what- ever amount may be found due on the mortgage to the defend- ant, Griffith. The questions arising upon the auditor's report, will be reserved until the proceeds of the sales come to be dis- tributed.

R. W. GILL and S. J. K. HANDY for Complainants.

O. HORSEY, and T. S. ALEXANDER for Defendants.

[The defendants entered an appeal from the decree in this cause, which was argued at the last term of the Court of Ap- peals, by Thomas S. Alexander and John Nelson, Esqrs., for the appellants, and John V. L. McMahon and Reverdy John- son, Esqrs., for the appellees, when the appellate court affirm- ed the decree *for the reasons assigned by the Chancellor.* Thus the above opinion has been adopted by the highest judicial tri- bunal in the state, and, therefore, becomes a part of the law of the land.]