Montgomery v. Phillips.

---

John A. Montgomery, receiver &c., appellant,

*v.*

Henry D. Phillips et al., respondents.

1. A board of directors of an insolvent corporation cannot, by mortgage upon the corporate property, secure one of the directors the payment of an antecedent debt due by the company to such director, or a previous liability incurred by such director for the corporation.

2. A mortgage was made by a solvent company to one of its directors, under an arrangement that such mortgage should be kept from record for the purpose of strengthening the credit of the company, while the directors should test the success of the corporate business at the risk of future creditors, and the mortgage was not recorded until the corporation became insolvent.—*Held*, that such mortgage was fraudulent.

---

On appeal from a decree advised by Vice-Chancellor Bird, whose opinion is as follows:

I will first consider whether Thomas B. Sewell became a stockholder and thereby eligible to be elected a director, and so clothed with authority to participate in the management of the affairs of the corporation. The utmost that can be made of

Phillips' testimony is that he advanced the money ($700) for the purchase of twenty-three shares owned by Martinette, and that he advanced this money to Sewell; that Sewell immediately bought the stock in his own name and thereby became a director. Giving this the utmost force from Phillips' standpoint, it was not so understood by Thomas B. Sewell—that is, that the mere act of purchasing made the stock his. Certain it is that Sewell's testimony is in very strong contradiction of Phillips' understanding of the case. He says he acted as a director of the company from January, 1892, until in May, when it failed. It is alleged that, on the 15th of January, 1892, the company was reorganized, and Sewell says that he did not look into the affairs of the company. He neither knew anything about its assets or its liabilities, nor had he any idea of the value of its stock. I think it is clear from the testimony that Sewell did nothing in the interest of this company, except to attend a few meetings of the directors which were held between the 15th of January and the 10th of May. On the 15th of January he says he did not hold any position in the company except that of stockholder. He afterwards says that he owned twenty-three shares of stock. Mr. Martinette was the prior owner of this stock. If Sewell became the owner of any stock, it was this stock so owned by Martinette.

Upon being asked whence he got the money with which to purchase the stock, he said:

"*A*. Mr. Phillips lent it to me.

"*Q*. When you went to Mr. Martinette, for whom were you purchasing the stock?

"*A*. For my brother, Michael Sewell.

"*Q*. Did you tell Mr. Martinette for whom you wanted the stock?

"*A*. Yes, sir.

"*Q*. Had you had a prior conversation with your brother about it?

"*A*. Yes, sir; he says I did not own any property; he has nothing outside of his earnings.

"*Q*. After you left my office, on the 12th of January, with the twenty-three shares of stock issued to Mr. Martinette, and had delivered this paper, the receipt, to me, who was the owner of the twenty-three shares of stock?

"*A*. I was.

"*Q*. You went there to buy it for your brother, did not you?

Montgomery v. Phillips.

"*A.* I had possession of it.

"*Q.* Mr. Phillips sent you to buy it for your brother, didn't he?

"*A.* Yes, sir.

"*Q.* Were you the owner simply because you had possession of it?

"*A.* My brother refused to take it.

"*Q.* Why did you sign the name of 'Henry D. Phillips, per yourself?'

"*A.* That is a common way of my signing papers.

"*Q.* Did you receive that from me for Henry D. Phillips?

"*A.* No, sir.

"*Q.* Did you sign it 'Henry D. Phillips, per you?'

"*A.* I was the owner of it, because my brother refused to take it, and I was the owner of it from that time.

"*Q.* You did not know till the next day that your brother refused to take the stock, did you?

"*A.* No, sir.

"*Q.* In the meantime he was the owner of the stock?

"*A.* My brother was.

"*Q.* You said a moment ago you were the owner?

"*A.* My brother was the owner, but I had the possession.

"*Q.* Whose money was it, as you understood it, the $700; was this your money or Mr. Phillips' at that time?

"*A.* It was Mr. Phillips' money.

"*Q.* And you understood the stock was your brother's, and you simply had possession of it?

"*A.* Yes, sir.

"*Q.* Why did you state that Mr. Phillips loaned you the $700?

"*A.* He loaned it to me as agent for my brother.

"*Q.* Did you expect to pay it back to him?

"*A.* Certainly I did.

"*Q.* On the 11th of January, when you received that money from Mr. Phillips, did you expect to pay it back?

"*A.* Yes, sir, I did.

"*Q.* And Mr. Phillips was buying the stock for your brother?

"*A.* Yes, sir; I bought the stock for my brother; my brother said that he would not take the stock and I took the stock, and after that considered myself indebted to Mr. Phillips, and do now.

"*Q.* On the 11th of January did you understand this stock to be your brother's or Mr. Phillips'?

"*A.* My brother's."

Thomas B. Sewell himself said that he had no property. He depended entirely upon his weekly wages. Phillips says that he earned $9 per week, and at one time for a short period only $7.

"*Q.* What arrangement was made to pay you; you stated on your direct examination that Thomas was to take the stock and act as a director until he could sell; was that the understanding between you?

"*A.* The arrangement was he was to take that stock just as his brother did, and he was to pay me back after he sold it; I do not think he was to pay me back until he sold it, but I expected him to sell it.

" By the Court—What if he did not sell it?

"*A.* We did not go into that; if he did not sell the stock, I was to be the loser if I could not get the money."

Thomas Sewell says that, at and before the time of this transaction, he knew nothing about the condition of the affairs of the company. He had no knowledge of its assets. He had not, nor did he at the time make any examination of the affairs of the company, or of its assets, or of the value of said assets.

On the 5th day of March, 1892, a resolution was passed authorizing the execution of a chattel mortgage by the company to Phillips, to secure the payment of a promissory note upon which was then due $650. This mortgage was never recorded and of no value as a security against creditors. Afterwards, on the 17th day of March, 1892, a resolution was passed authorizing the company to execute a mortgage upon its real estate to Henry D. Phillips, to secure him against his endorsement upon a note for $4,300 given to the First National Bank, and also authorizing the execution of a mortgage upon all its chattels, " to secure the payment of a loan of $650 made March 5th, 1892, and ' any liability on above note.' " This refers to the $4,300 note. This resolution as is stated was passed on the 17th of March, with the exception of the last five words. Those words were added on the 9th day of May following. And it is agreed on all hands that those words were added afterwards, and there is nothing whatever in any of the minutes to show any authorization for such addition. It is claimed, however, that at an informal meeting of Shellenberger, Phillips and Sewell, it was agreed amongst them that these words should be added, and it is claimed that this is sufficient authority for their addition, and that being added in this informal way they became part of the resolution and as binding as though the words had been regularly incorporated therein. Mr. Phillips himself says

that there were no other meetings after March 17th, except those which were recorded in the book of minutes.

"Q. There is a meeting of April 23d, May 10th and May 18th—are you to be understood that they were the only three meetings of the board of directors held subsequent to the 17th of March; I mean as a board of directors?

"A. Yes, sir; there was only one other meeting; that was just prior to the execution of the second chattel mortgage.

"Q. Where was that meeting held?

"A. At my office; Mr. Sewell, Shellenberger and myself were present; it was an informal meeting, and the result was the addition of these five words; there was no record kept of that meeting.

"Q. Was there anything else done at that meeting?

"A. No, sir; not that I remember; probably the business of the company was gone over; I don't remember anything else.

"Q. How did Mr. Shellenberger come to your office that morning; was it for this purpose?

"A. The day he came there he came for the purpose of executing that mortgage and doing what was necessary in connection with it—the chattel mortgage of the 9th of May; he signed it that afternoon, at the time the informal meeting was held."

Thus it appears that, on the 9th day of May, when they came to execute a chattel mortgage which had been previously authorized for the purpose of securing the $650 note, they added to the resolution the said five words, and "any liability on above note," referring to the $4,300 note, which had been secured by the real estate mortgage, by a resolution passed March 17th, almost two months previously. They made this resolution by an interchange of words between themselves. At best it was nothing more than this. There was not only no formal resolution passed and written upon the minutes, but there was not even the form of a resolution in writing.

However informally it was done, the mortgage was executed. Phillips, to whom it was delivered and who was the creditor, was the treasurer of the concern. Shellenberger, who executed it as president, was such officer. Sewell, who witnessed it, was one of the directors. There were no other directors than these three. There may be some uncertainty as to whether they were all three together when an agreement was had that such mortgage should be executed, but as intimated, whether that be so or

not, they all at one time or another joined in its execution— Shellenberger, by executing it as president; Sewell, by witnessing it and making the proof thereof, and Phillips, the creditor, by accepting it as security. In the presence of the others, Phillips says, " I explained the defect of the former mortgage."

"*Q.* What do you mean by that?

"*A.* It was explained to Mr. Sewell and Mr. Shellenberger that this chattel mortgage I held, in case the first mortgage was put in execution and there was a surplus, and there was a deficiency in the real estate mortgage, I would be a loser to a considerable amount; and that it was the understanding and the desire of the Capital Cracker Company to protect me as fully as possible; and that there was no provision in that mortgage as to the surplus, because there was a mistake in it at the time it was drawn, and this mortgage was drawn for the purpose of curing that defect.

"*Q.* Did you tell them it was the purpose of the Capital Cracker Company to secure you at that time?

"*A.* No, sir; not in these exact words, but in that sense.

"*Q.* Did you mean that you, as the Capital Cracker Company, intended to secure yourself?

"*A.* I did not; I am not the Capital Cracker Company, nor never was.

"*Q.* The original chattel mortgage was given to secure $650?

"*A.* Yes, sir; that is true.

"*Q.* And that did not secure you from any loss on the $4,300?

"*A.* No, sir.

"*Q.* And the object of that chattel mortgage was to extend the security to the $4,300?

"*A.* It was the object to carry that surplus to the $4,300 note; that is the only answer I can give, sir.

"*Q.* Was anything said by you as to including these five words, 'and any liability on above note,' to the March 17th meeting and resolution?

"*A.* No, sir; I think not.

"*Q.* You took that upon yourself, after the mortgage was executed, to add the words, 'any liability on above note?'

"*A.* Yes, sir; as secretary of the Capital Cracker Company, I did.

"By the Court—Is there anything on the books of the company with reference to any liability on above note, except the words there appended to that resolution?

"Witness—No, sir; there is nothing."

The foregoing statement of facts presents a very singular condition of affairs. It is not surprising that when such a situation was made known to creditors, or to the receiver of the defendant corporation, the conviction should arise that all was conceived

in fraud.   There was an old corporation reorganized on the
15th of January, and as so reorganized was turned over to a
receiver on the 20th of the May following.   Yet certain facts
are interspersed which lead the mind to the conviction that they
could scarcely exist if the purpose of those who were engaged in
the management of the defendant company was a concoction and
perpetration of a scheme to injure honest creditors.   The facts
to which I refer are the complete prostration of the company
before its reorganization, the purchase of a large number of
shares of stock by Phillips, the advancement of $700 for the
purchase of twenty-three shares, which he says he gave to Sewell
in order that Sewell might become a director, the reorganization
of the company, the loaning of $750 to the company for its own
benefit, and afterwards endorsing the note of the company for
$4,300 which was reduced to $4,000, and trusting the company
for the payment of these sums for some time before the execu-
tion of either the real estate or the chattel mortgage.   It does
not seem reasonable to suppose that a business man would at-
tempt the resuscitation of a defunct company, and would also
invest several thousand dollars in its business for the mere pur-
pose of experimenting with creditors, when, according to all
experience, the probabilities were against his making it a finan-
cial success, on the belief that he could cover up the fraud by
means of which he might expect to carry the work through.

The observations just made should be kept in mind in con-
sidering the other facts developed, and which were relied upon
by the complainant.   In the first place, it is insisted that there
really was no reorganization of the company.   This is based
upon the allegation that Thomas B. Sewell never became a stock-
holder, and consequently never could be a director.   Taking the
testimony of Sewell alone, it would be extremely difficult to get
to the conclusion that he regarded himself as at all interested.
It is true, he says now he had possession of the stock, and now
he says he bought it for his brother.   But however variable
may have been the condition of his mind in relation to the facts
of the case, the evidence is that he acted as a director.   Phillips
himself swears that, when Michael Sewell refused to take the

14

stock, he told Thomas B. Sewell that he should take it. The result of his testimony is that he advanced the $700, which was paid to Martinette for this stock, for the purpose of having some one become the owner of the stock, in order to comply with the law in reorganizing the company, to do which there must be three stockholders and three directors. When he learned that Michael would not take the stock, he then said to Thomas that his $700 was invested anyhow, and that he (Thomas) must take the stock and act as director. It is true that the statement of Phillips with a party with whom he was negotiating for a sale of some shares of stock, was the owner of forty-one shares, was inconsistent with Sewell's being the owner of any, for without these twenty-three shares Phillips could not have been the owner of forty-one. There is nothing, however, to show that Sewell was present at this interview, or that he ever assented to any declaration of Phillips of the ownership of these twenty-three shares. But whatever was in the mind of these parties subsequent to the reorganization, there is no room for doubt but that at that time Phillips had put himself in a position towards Sewell by which Sewell could have enforced the claim to the ownership of these shares. It was upon this foundation that Sewell was made a director and participated in the reorganization and in the future managing of the affairs of the company. Without reaching this conclusion there was, indeed, no reorganization and no company, and consequently nobody with whom dealers could act except as individuals. If the facts in the case should lead us to decide that there was no reorganization and consequently no company, then it is clear that creditors would be no better off and the receiver would show himself out of court. The receiver has no standing unless it be shown that there is a corporation, such as is contemplated by the statute, whose assets are committed to him for distribution.

It may be that Thomas B. Sewell was, as it is styled in the bill, " a mere figure-head," acting solely upon the suggestions of Mr. Phillips, echoing his sentiments or obeying his commands. There is not a little testimony in the case to justify this insistment. It is true that the statute declares that every

Montgomery *v.* Phillips.

·director shall be a *bona fide* stockholder, and it is equally true that it would be far better for the business community were this ·direction enforced in the highest and best sense, yet enough is known of the management of corporations in this state to justify ·the observation that a very large number of corporations organized under our statute are controlled and really owned by one or two individuals only, notwithstanding there may be a third or fourth director, but only so in name.

Therefore, I come to the conclusion that there was a lawful ·organization, and that the same stockholders who were made ·directors and reorganized the company continued its management ·until the filing of the bill asking that the company be declared insolvent and that a receiver should be appointed.  The receiver ·in this case owes his appointment to the proceedings under that bill.  Every step which has been taken has been upon the premise that there was a corporate existence.  Had creditors come into court and set up all these facts, and declared that the scheme was adopted for the sole purpose of deception and of defrauding creditors, praying for the aid of the court in the premises, the ·argument of counsel against the allegation that there is a corporation would have had some force.  But I am unable to comprehend how the complainant can come into court as the receiver ·of a corporation and attempt to establish the fact that no corporation in reality existed.  In the next place, it is urged that the two mortgages—one upon the real estate to secure the loan of $4,000, and one upon the personal estate to secure the same loan and also the loan of $650—are fraudulent.  The view taken by counsel is that they are fraudulent as to creditors for the reason ·above given, with respect to the reorganization of the company, and that the chattel mortgage is void if not fraudulent, because there was no proper incorporated authority for its execution.

With respect to the allegation of fraud, I find no proof in support.  As intimated, the $650 was advanced for the benefit of the company, and the $4,000 note was endorsed and the money used for a like purpose.  There is not a shadow of testimony to the effect that either the one or the other was made ·with the view of wronging anyone.  The result shows that it

was done with as fair a chance of misfortune to the lender and
endorser as the contrary. If the loan and the endorsement were
honest transactions, then Phillips had a right to demand protec-
tion against loss, and the company had a right to pledge all its
assets, not otherwise under pledge, to him as security. The
company undertook to do this. The attack upon the real estate
mortgage I regard as having been abandoned. The mortgage
upon the chattels has the advantage of being properly executed.
To this extent the defence of Phillips to the assault is complete.
However, the presumption arising from this situation has been
assailed. It is urged that this mortgage was executed without
any authority. There is no doubt but that the president executed
it, the secretary witnessed it and made the proper proof of its
execution, and Phillips, the mortgagee, accepted it for the pur-
poses therein expressed, but it is insisted that these were indi-
vidual acts and not the acts of the corporation. This fact is not
enough for the objectors to show to overcome the efficacy of an
instrument under the seal of the corporation. It must be clearly
established that there was no act of the body corporate author-
izing it. There can be no doubt but that there must be the cor-
porate act, which is presumed from the appearance of the seal
of the corporation. The weight of the testimony in this case,
notwithstanding the vagaries above referred to, instead of dis-
proving such corporate act, establishes the contrary. There was
no written resolution, but that is not essential to a corporate act.
So far as the testimony was presented for the purpose of dis-
crediting the seal proves anything, it proves that there was a
meeting of the directors at which they determined that Phillips
should have the benefit of this mortgage. I do not say that the
meeting was called for that purpose, or that it was called for
any purpose. I only say that there was a meeting at which all
three were present, during which it was agreed that Phillips
should not only have the benefit of the chattel mortgage to
secure the $650, but also as further security for his endorsement
upon the $4,000 note.

Very much was said upon the argument concerning the addi-
tion to the resolution, above quoted, of the five words, and "any

Montgomery *v.* Phillips.

liability on above note." This resolution was adopted and entered upon the minutes upon the 17th day of March, except said five words. The words so added were not added until about the date of the execution of the chattel mortgage, which was May 9th following. The testimony of Phillips makes it clear that he had no authority to add those words to the resolution dated March 17th. It is clear, therefore, that these words have no force whatever as they are there written. It is equally clear that this fact does not impair the presumption which arises from the presence of the seal upon the mortgage which is assailed. It is equally clear that the absence of any resolution to execute such mortgage, upon the minutes of the corporation, does not overcome the presumption. But as intimated in the effort upon the part of the complainant to overcome this presumption, the weight of the testimony is rather in support of the presumption than against it. Therefore, the effort to make it appear that this mortgage, as security for the $4,000 note, is void, has likewise failed.

There is nothing in the case which leads me to question the propriety of the assignment of the book accounts to the First National Bank. The company was debtor to the bank, and the company had the same right to secure the bank that it had to secure any other creditor.

Nor do I find any testimony to satisfy me that the sale of the goods and chattels of the company, under the chattel mortgage, should be declared illegal. The complainant asks for an accounting. As I understand the testimony, the sale of the goods and chattels covered by the mortgage did not produce enough to satisfy the amount due thereon, but whether the real estate has been sold or not under the mortgage referred to, I believe does not appear. If both the real and personal estate have brought more than enough to satisfy the claim of Phillips, the receiver will be entitled to an accounting, and he will be entitled to an accounting in any event if he deems it to the interest of creditors to demand it, taking upon himself, of course, the risk of the costs attending such accounting.

*Mr. John H. Backes,* for the appellant.

*Mr. William M. Lanning* and *Mr. Woodbury D. Holt,* for the respondents.

The opinion of the court was delivered by

REED, J. ·

On August 14th, 1890, the Capital Cracker Company was organized with an authorized capital stock of $20,000, divided into two hundred shares of $100 each. Of this amount of capital stock, $7,500 were subscribed and paid for. The company bought a tract of land, and built a cracker factory upon it. About January 1st, 1892, the company was reorganized. The outstanding stock largely changed hands, and its officers were changed. All the outstanding seventy-five shares of stock, excepting thirty-four shares held by Herman H. Shellenberger, one of the original stockholders, was bought up with the money of one Henry D. Phillips.

Phillips claims that of the forty-one shares bought with his money, twenty-three shares were bought for one Sewell. These three persons—Shellenberger, Phillips and Sewell—held a stockholders' meeting on January 15th, 1892, and elected themselves directors, and elected Shellenberger, president and manager, and Phillips, secretary and treasurer.

The company at this time was indebted to different persons in an aggregate sum of $4,300. To pay these liabilities, the company, on January 20th, made a promissory note payable to the order of Phillips and Shellenberger, for the sum of $4,325, which note endorsed by the payees was discounted by the First National Bank.

On March 7th, 1892, Phillips loaned the company the sum of $650. On March 17th, by resolution of the board of directors, the president was authorized, for the purpose of indemnifying Phillips against his endorsement of the note, to make a mortgage of the real estate of the company to Phillips; and for the purpose of securing Phillips for the loan of $650, the president

was authorized to execute a mortgage upon the personal property of the company to Phillips.

On March 18th, 1892, the real estate mortgage was executed. The chattel mortgage was also executed on the same day, but was never recorded, and so does not figure further in the case.

On May 9th following, the company was insolvent. On that day the company assigned its book accounts to the First National Bank, to secure the $4,325 note endorsed by Phillips and Shellenberger. On the same day, the president made a second chattel mortgage to Phillips, to secure the $650 loan. On May 10th, Phillips recorded the real estate mortgage executed on March 18th. On May 23d, Phillips, under his last chattel mortgage, sold the personal property of the company.

On June 7th, the complainant, on the bill filed by certain creditors of the corporation, was appointed receiver of the company as an insolvent corporation.

The bill prays that the real estate mortgage and the second chattel mortgage made to Phillips, may be set aside, and that Phillips may be compelled to account for the receipts of the sale of the personal property made under the latter mortgage. It charges that the assignment of the book accounts to the First National Bank was fraudulent, and in fact, that the books never went from Phillips' possession, but that he has collected the accounts; that the bank has disclaimed any claim to the said books. The prayer of the bill is that Phillips may account for the sums he has so collected.

The bill also charges that Phillips employed one Robert Green and paid him $20 per week, with the understanding that this should be charged up to the company, while Green was to repay $10 each week to Phillips. There is also a prayer that he account for these $10 weekly receipts.

I will consider the subjects involved in the litigation in an order inversely to that in which they were just stated.

In respect to the claim that Phillips personally received and held a portion of the wages of Green, charged up to the company, I think the complainant has made no case. Phillips says that Green was not able to do his work, and that he, Phillips,

was compelled to get other employes to do a portion of it, and the money was retained on this account, and has, as I understand it, been used for corporation purposes; at least, the misapplication of corporate money is not proved with any degree of certainty.

In respect to the assignment of the book accounts to the bank, I also think it has not been successfully attacked. The line of assault contained in the bill is not sustained by proof. While the books did technically remain in the hands of Phillips, the undisputed testimony is that the assignment was made to the bank and the books were submitted to the bank officers; that the bills were collected, with the approval of the bank, in the name of the solicitor of the bank; the moneys received from them were paid to Phillips, who deposited the money in the bank, to be applied to the payment of the note.

While the payment of the money to Phillips has an air of oddity, yet no one is called to contradict the statement that the assignment was presented to the bank, and that the money was subsequently collected for and was paid to the bank, to be applied to the payment of this note. The attack upon the assignment, made upon the argument, was put upon another ground, namely, that Sewell was not a legal director, and so there was no board existing qualified to make the assignment. But whether Sewell was or was not a *de jure* director, he was admittedly a *de facto* director. In respect to the bank, which was a third party, with no notice of the defect, if any existed, in his eligibility, the assignment was entirely efficacious.

The next attack is upon the chattel mortgage, by color of which Phillips sold the personal property. This mortgage was, as I have already remarked, executed on May 9th, 1892. At that time the corporation was insolvent. The mortgage was made to secure the antecedent liability of Phillips, as endorser for the benefit of the company. The mooted validity of this mortgage involves the question whether the board of directors of an insolvent corporation can secure one of their own members for an antecedent debt by a mortgage of the property of the company. The question is new in this court.

Montgomery *v.* Phillips.

It was held in the case of *Wilkinson* v. *Bauerle, 14 Stew Eq. 635,* that an insolvent corporation could sell its property to a director if the sale was *bona fide* and brought the full value of the property.    It was held that the officers of such corporation could not divert the corporate property from the payment of its debts, and it was because such a sale was only a transmutation, and not a diversion of the property, that the sale was sustained.

It was also held in *Vail* v. *Jameson, 14 Stew. Eq. 648,* that a mortgage made by an insolvent corporation for the purpose of preferring a creditor was not invalid.    The great weight of authority is, however, opposed to the existence of any power in a board of directors of an insolvent company to prefer one of its own members.    The weight of authority is in support of the wholesome rule that the directors of an insolvent corporation are trustees of its funds for its creditors.    *Curran* v. *State of Arkansas, 15 How. 307 ; Haywood et al.* v. *The Lincoln Lumber Co., 64 Wis. 639 ; Wilkinson* v. *Bauerle, 14 Stew. Eq. 635.*

The doctrine in respect to the power of trustees to use trust property for their own benefit to the disadvantage of their *cestuis que trust* thus becomes applicable to the dealing of directors with the funds in their hands, after the insolvency of the corporation. If any of such directors are creditors, they stand upon the same footing as any other creditors ; but by no act of such director can he obtain a position superior to that of the other creditors for whose benefit he holds the trust assets.

Mr. Morawetz remarks :

"It is the duty of the directors, or other agents of insolvent corporations, to preserve its assets for the benefit of the creditors.    The legal ownership of the assets is not altered by its insolvency, and the regular agents of the corporation retain the same powers of management with which they were originally invested.    But upon the insolvency of a corporation, an equitable lien of the creditors attaches upon all the company's assets ; and the directors who only formerly stood in a fiduciary relation to the corporate members, become placed in a fiduciary relation to its creditors.    * * *    If themselves creditors, they cannot receive any advantage or preference in the payment of their claims at the expense of other creditors."    *Morawetz Corp. § 579.*

In *Haywood et al.* v. *The Lincoln Lumber Co. et al., supra,* a mortgage had been made by an insolvent company to some of

the directors, to secure an antecedent debt. The mortgagee filed a bill to foreclose the mortgage, which suit was defended by the receiver of the corporation. The court, in holding that the mortgage was void, employed this language: "The directors and officers made the mortgage, or directly caused it to be made, to themselves. They occupied a fiduciary relation to the company, its stockholders and its creditors, and they had no right to use such relation and their official position for their own benefit, and to the injury of others in equal right. In *Beach* v. *Miller, 130 Ill. 162,* the question arose whether an insolvent company could secure an antecedent debt due a director by a sale to him of its property to pay such debt. The court remarked that so long as a corporation remained solvent, its directors were agents or trustees for the stockholders; but the moment it became insolvent, its directors occupied a different relation. The assets must then be regarded as a trust fund for the payment of all its creditors, and the directors occupy the position of trustees, and the fiduciary relation then existing, they may, with propriety, be prohibited from purchasing the trust property."

The court was speaking in view of the fact that the purchase was to be paid for by the application of the precedent credit held by the director.

In *Richards* v. *New Hampshire Insurance Co., 43 N. H. 263,* on a bill filed by the creditors of an insolvent company, it was held that the directors were trustees of the funds for the creditors, and were bound to apply them *pro rata,* and could not use them to exonerate themselves to the injury of other creditors.

All the cases bearing upon this question are collected by Mr. Justice Woods in his opinion in the case of *Lippincott et al.* v. *Shaw Carriage Co. et al., 25 Fed. Rep. 577, 586.*

He very carefully states the rule to be derived from these cases in these words: "It has been often said by judges, including those of the federal supreme court, that the property of an insolvent company is a trust fund, and that the directors are trustees for the creditors; and if this were strictly so, it is manifest that no preference whatever should be allowed between creditors standing in the same relation to the fund. These statements are,

however, true in a qualified sense, and lead legally, if not necessarily, to the conclusion that in such cases, the directors, if they give preferences, must do it unbiased by considerations of personal advantage or gain."

I regard this as a salutary rule, grounded upon general equitable principles. This view invalidates the chattel mortgage executed on May 9th, to Phillips, as mortgagee.

Lastly, in respect to the real estate mortgage made to Phillips to secure him for his endorsement. It appears that this mortgage was authorized by the board of directors on March 17th, and was executed on March 18th, and was recorded May 10th. If it was delivered at the time it was executed, it would not be invalidated by the rule just applied to the chattel mortgage of May 9th.

The bill states that the company was insolvent on May 9th, therefore, upon the pleadings, the real estate mortgage was executed while the company was still solvent. What became of this mortgage after it was executed does not appear. There is no allusion in the pleadings nor in the evidence to the custody of this instrument, from the date of its execution to the time of its registration.

Now I think that some evidence should have been produced to show that the mortgage was actually delivered, and so became an executed contract between the company and Phillips before the day it was recorded.

But aside from this view of the legality of that instrument, I think there is another aspect in which it is defective, when, as now, attacked by the representative of the creditors.

The mortgage, as I have already remarked, was kept from record until after the company became insolvent.

The bill charges, and the charge is not denied, that all the debts were contracted between the date of the execution and the date of recording the mortgage.

Now, it is admitted that the mere failure to record a mortgage is not in itself a conclusive reason for setting it aside for the benefit of subsequent creditors having no specific liens, but that any concealment of an instrument of this kind is a badge of

fraud, which may, by reason of the circumstances surrounding the concealment, be sufficient ground for avoiding such an instrument in respect to subsequent creditors, is entirely settled.

In *Hungerford* v. *Earle, 2 Vern. 261,* it was held that a deed, not at first fradulent, may afterward become so by being concealed or not pursued, by which means creditors are drawn in to lend their money.

The failure to record a deed or mortgage when there is no apparent change of possession, has been held in a number of cases to be a strong circumstance against the validity of such instrument when it was attacked by the creditors, who become such intervening the time of its execution and the time of its record. *Coates* v. *Gerlach, 44 Pa. St. 43; Gill* v. *Griffith, 2 Md. Ch. 270; Hilliard* v. *Cagle, 46 Miss. 309; Neslon* v. *Wells, 104 U. S. 428; Blennerhassett et al.* v. *Sherman, 105 U. S. 100.*

Now, in respect to the circumstances surrounding the execution of the present mortgage, the evidence is very strong that at the time this instrument was executed Shellenberger and Phillips held all the outstanding stock of the corporation. The shares ostensibly held by Sewell were bought with Phillips' money, and although Phillips claims that there was an understanding that Sewell was to repay him, the conduct of both Phillips and Sewell is very persuasive that Phillips was to practically control the stock, and that the transfer of it to Sewell was for the mere purpose of equipping him with the nominal character of stockholder, so that he could be elected to constitute the required third director.

Phillips was an active agent in resuscitating the moribund corporation. He and Shellenberger were, in fact, the corporation. They had made, as the corporation, and both individually endorsed, the promissory note, by the discount of which the debts of the company, including a debt to Phillips himself, were paid.

The real estate mortgage was made to secure Phillips against his liability upon this note, and incidentally to secure Shellenberger also. The original chattel mortgage was to secure Phillips for the additional advance of $650. The future financial success of the company was, in the light of its past failure, problematical.

If it should succeed, there would be no use for the two mortgages; if it should fail, then they were to be resorted to for indemnity. The experiment was to be made at the risk of future creditors. For the purpose of leaving the credit of the company unimpaired, the mortgages were kept from record. When insolvency came, it was too late to record the chattel mortgage, so the real estate mortgage only was registered.

I have no doubt from the testimony that these were the motives which induced the delay. When it is kept in mind that Phillips was the active officer for the corporation who caused the execution of the mortgage, as well as the mortgagee for whose benefit it was made, the whole arrangement was equivalent to an agreement between the parties, mortgagor and mortgagee, to keep the mortgage from record for the purpose of sustaining the credit of the company by concealing its existence.

Under these circumstances, I think the mortgage must be regarded as made to hinder and delay creditors, and so held to be fraudulent.

The decree of the court of chancery should be reversed, and a decree made in conformity with the views herein expressed.

*For reversal*—DEPUE, DIXON, GARRISON, LIPPINCOTT, REED, VAN SYCKEL, BOGERT, BROWN, SIMS—9.

*For affirmance*—None.